UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EHO360, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| NICHOLAS OPALICH, TAMMY RADCLIFF, | ) | |
| CREVICE CAPITAL PARTNERS, LLC, | ) | |
| HEALTHVIEW CAPITAL PARTNERS, LLC, and | ) | |
| HOSPISRX, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff EHO360, LLC ("EHO" or "Plaintiff") files this Original Complaint against Defendants Nicholas Opalich, Tammy Radcliff, Crevice Capital Partners, LLC, HealthView Capital Partners, LLC, and HospisRX, LLC, and in support thereof would respectfully show the following:

### PRELIMINARY STATEMENT

1.      EHO brings this action against two of its former executives who pilfered EHO's confidential and proprietary information and formed a competing business in concert with two investment companies and one of EHO's longtime clients. In this action, EHO seeks monetary damages and injunctive relief prohibiting its former executives from continuing to breach their restrictive covenants and prohibiting all Defendants from using EHO's confidential and proprietary information to unfairly compete with EHO.

**PARTIES**

2.      EHO is a Texas limited liability company with its principal place of business in Belton, Texas.  EHO is a citizen of the State of Texas, as all of its members are Texas citizens.

3.      Defendant Nicholas Radcliff is a citizen of the State of Ohio, residing at 18275 Bent Tree Ln., Chagrin Falls, Ohio 44023.

4.      Defendant Tammy Radcliff is a citizen of the State of Georgia, residing at 1710 Woodlawn Avenue, Gainsville, Georgia 30501.

5.      Defendant Crevice Capital Partners, LLC ("Crevice") is a New Jersey limited liability company with its principal place of business at 555 Church Street, Apt. 2107, Nashville, Tennessee 37219.  Based on information available to Plaintiff, none of Crevice's members is a citizen of the State of Texas.  Therefore, Crevice is not a citizen of the State of Texas and there is diversity of citizenship between EHO and Crevice.

6.      Defendant HealthView Capital Partners, LLC ("HealthView") is a North Carolina limited liability company with its principal place of business at 3124 Zebulon Road, Rocky Mount, North Carolina 27804.  Based on information available to Plaintiff, none of HealthView's members is citizen of the State of Texas.  Therefore, HealthView is not a citizen of the State of Texas and there is diversity of citizenship between EHO and HealthView.

7.      Defendant HospisRX, LLC ("HospisRX") is a Delaware limited liability company. HospisRX's registered agent for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  Based on information available to Plaintiff, HospisRX does not have a principal place of business and none of HospisRX's members is a citizen of the State of Texas.  Therefore, HospisRX is not a citizen of the State of Texas and there is diversity of citizenship between EHO and HospisRX.

### JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of the parties and the amount in controversy, including the amount of attorneys' fees recoverable by contract and statute and the value of the rights sought to be protected via injunctive relief, exceeds $75,000.

9.      Defendants Opalich and Radcliff are subject to personal jurisdiction in this Court because they entered into contracts with a Texas resident, EHO, which were to be performed, in whole or in part, in the State of Texas.  Further, Opalich and Radcliff had numerous contacts with the State of Texas, as detailed herein, which give rise to EHO's claims.  In addition, Opalich agreed that the exclusive and mandatory venue for any dispute between him and EHO would be in the state or federal courts of Dallas, Texas.

10.     Defendant Crevice is subject to personal jurisdiction in this Court because it entered into a contract with a Texas resident, EHO, which was to be performed, in whole or in part, in the State of Texas.  Further, Crevice had multiple contacts with the State of Texas, as detailed herein, which give rise to EHO's claims.  In addition, Crevice engaged in intentional tortious conduct, directed at the State of Texas, which Crevice knew or should have anticipated would cause EHO injury in the State of Texas.

11.     Defendants HealthView and HospisRX are subject to personal jurisdiction in this Court because they engaged in intentional tortious conduct, directed at the State of Texas, which they knew or should have anticipated would cause EHO injury in the State of Texas.

12.     Venue is proper in this district because a substantial part of the events or omissions giving rise to EHO's claims occurred in this district and all defendants are subject to personal jurisdiction in this district.  *See* 28 U.S.C. § 1391(b).

**FACTUAL BACKGROUND**

A.    **EHO's Nearly 30-Year History as a Leading Prescription Claims Processor and Pharmacy Benefit Manager**

13.    Since 1993, EHO has been a leading prescription claims processor and pharmacy benefit manager focusing on administering prescription claims for hospice programs, health maintenance organizations, third party administrators, preferred provider organizations, other pharmacy benefit management companies, employers, workers compensation programs, patient assistance programs, and fraternal groups.  EHO provides a wide variety of services for its clients, including designing and implementing pharmacy plans and performing ongoing administration of pharmacy plans.

14.    Over the course of nearly three decades, EHO has developed a significant amount of valuable confidential and proprietary information that has allowed it to become a leader in its field, including, but not limited to, numerous client relationships, unique customer service strategies and processes, unique pricing structures, unique pharmacy benefit plans, unique plan implementation and administration strategies, and unique technology.

B.    **EHO Hires Opalich as its Chief Executive Officer, and Opalich Agrees to Certain Restrictive Covenants**

15.    On February 1, 2019, EHO hired Opalich to serve as the company's Chief Executive Officer pursuant to an Executive Employment Agreement (the "Opalich Agreement"). Although the Opalich Agreement is between Opalich and an EHO affiliate, SPCGT Management, LLC ("SPCGT"), Opalich served as EHO's Chief Executive Officer, EHO is listed as a third-party beneficiary of the Opalich Agreement, and SPCGT subsequently assigned all its rights under the Opalich Agreement to EHO.

16.     In exchange for a six-figure salary and various other benefits, Opalich Agreed to "devote his full-time attention and energies to the performance of his duties as an executive of [EHO]," and to "devote his best efforts, business judgment, skill and knowledge exclusively to the advancement of the business interests of [EHO] and its affiliates."

17.     In addition, Section 9 of the Opalich Agreement contains certain ancillary restrictive covenants, which Opalich expressly agreed "are reasonable and properly required for the adequate protection of [EHO] and its affiliates."

18.     Under Section 9(a) of the Opalich Agreement, Opalich agreed that he would keep all of EHO's confidential information in a fiduciary capacity for the sole benefit of EHO and its affiliates, and that, "for a period of five (5) years immediately after the termination of his employment for any reason" he would not: (a) disclose, directly or indirectly, any of EHO's confidential information to any person; (b) use any of EHO's confidential information in soliciting the patronage of any person for the purpose of providing products or services of the same or similar kind provided by EHO; or (3) use any of EHO's confidential information for his own purposes or for the benefit of any other person.  Opalich further agreed that, upon the termination of his employment, he would deliver to EHO all data, notes, letters, documents and records which may contain EHO's confidential information and destroy any and all copies and summaries of such notes, letters, documents and records.  Likewise, Opalich agreed that, upon the termination of his employment, he would promptly deliver to EHO all "customer lists, memoranda, research drawings, blueprints, forms, and other documents supplied to or created by him in connection with his employment" and all of EHO's or its affiliates' equipment and other materials.

19.     Under Section 9(b) of the Opalich Agreement, Opalich agreed that, from the date of his termination until February 1, 2021, he would not: (a) "solicit, divert, take away, do business

with, provide information about or attempt to do any of the same" with respect to any EHO client or prospective client; (b) provide services of the type he was providing to EHO and its affiliates to any other person engaged in the same or similar business as EHO; (c) "enter into the employ of, render any service to, or act in concert with" any person engaged in the same or similar business as EHO; (d) become interested in a business that is the same or similar to EHO's business, "as a proprietor, partner, shareholder, member, director, manager, lender, officer, principal, agent, employee, or consultant or in any other relationship or capacity;" or (e) "induce, call on, make an offer to, hire, attempt to hire, provide information about or attempt to do any of the same with respect to any employee of [EHO] or any of its affiliates."

20.    Significantly, Section 9(d) of the Opalich Agreement expressly provides that, if Opalich "breaches any of his obligations under this Section 9, then any time period set forth in this Agreement, including the periods set forth in Section 9, will be deemed tolled as of the time of such breach and will remain tolled until such breach ceases to exist."

21.    Further, Section 9(c) of the Opalich Agreement provides that, upon any breach or attempted breach of the restrictive covenants contained in the Opalich Agreement, EHO and its affiliates are "entitled to enforce the specific performance of this Agreement by [Opalich] in any court of competent jurisdiction and to both temporary and permanent injunctive relief without bond and without liability should such relief be denied, modified, or violated."

## C.    EHO Hires Radcliff as its Executive Vice President of Hospice PBM Division, and Radcliff Agrees to Certain Restrictive Covenants

22.    On or about July 1, 2020, EHO hired Radcliff to serve as its Executive Vice President of Hospice PBM Division pursuant to an Employment Agreement (the "Radcliff Agreement"). Opalich had a previous relationship with Radcliff and personally recruited her to EHO.

23.    In exchange for a six-figure salary and various other benefits, Radcliff agreed to devote her "full business energies, interest, abilities and productive time to the proper and efficient performance of [her] job duties" for EHO.  In addition, Radcliff agreed that during the term of her employment with EHO, she would "not acquire, assume or participate in, directly or indirectly, any position, investment or interest known by [her] to be adverse or antagonistic to [EHO], its business, or prospects, financial or otherwise, or in any company, person, or entity that is, directly or indirectly, in competition with the business of [EHO] or any of its affiliates."

24.    In addition, the Radcliff Agreement contains certain ancillary restrictive covenants that applied both during and for a period of time after the termination of Radcliff's employment with EHO.

25.    Under Section 2.3 of the Radcliff Agreement, Radcliff agreed that, for a period of twelve (12) months following the termination of her employment with EHO, for any reason, she would not "use confidential information to solicit or attempt to solicit the business of any client or customer of [EHO] or its affiliates with respect to products, services, or investments similar to those provided or supplied by [EHO] or its affiliates."

26.    Under Section 2.5 of the Radcliff Agreement, Radcliff agreed that she would not "circumvent, avoid, bypass or obviate [EHO] directly or indirectly, or interfere with or usurp any earning opportunity related to and/or following being introduced to a client, product, property, concept, strategy, opportunity, business relationship, project and/or source of capital by [EHO]."

27.    Under Section 5.2 of the Radcliff Agreement, Radcliff agreed that, both during and after her employment with EHO, she would not: (a) divulge any of EHO's confidential information to any person, firm or company or "use or exploit it in any way whatsoever (unless this is done for the benefit of [EHO] and its subsidiary companies);" or (b) through any failure to exercise

reasonable care and diligence, cause or permit any unauthorized use or disclosure of any of EHO's confidential information.

**D.     Opalich Downloads EHO's Confidential Information to External Hard Drives and Personal Email Accounts, Discloses EHO's Confidential Information to Crevice, and Begins Consulting for a Crevice Affiliate While Serving as EHO's Chief Executive Officer**

28.     Unbeknownst to EHO, shortly after he started working for EHO, Opalich began routinely downloading and saving EHO's confidential information to his personal external hard drives and emailing EHO's confidential information to his personal email accounts. Indeed, from February 2019 through September 2020, Opalich forwarded dozens of emails containing EHO's confidential information to his personal email accounts.

29.     In May 2020, Opalich sent an email from his EHO email address to Stephen Greene, the Managing Member of Crevice, with the subject line "Personal & Confidential." In the email, Opalich disclosed to Greene confidential information he had learned while working for EHO regarding the imminent formation of a new specialty pharmacy company and several related companies who would be potential clients of EHO. Opalich and Greene had a preexisting relationship, and this email was the first in a series of communications between Opalich and Greene, in which Opalich repeatedly disclosed EHO's confidential information to Greene and negotiated a consulting arrangement with a Crevice affiliate in violation of his fiduciary duties and the Opalich Agreement.

30.     On or about August 7, 2020, Opalich linked his personal email account, to which he had previously sent significant amounts of EHO's confidential information, to a file-sharing platform.

31.     On August 17, 2020, Opalich sent Radcliff a draft Consulting Services Agreement between himself and a Crevice affiliate and directed Radcliff to "Be creative." Under the

Consulting Services Agreement, Opalich was to "perform faithfully all duties assigned by the President of the [Crevice affiliate] relating to identifying and implementing growth opportunities for the [Crevice affiliate's] business to increase EBITDA and EBITDA margin for such business as needed by the [Crevice affiliate], including, without limitation, focusing on drug/therapy opportunities and reducing drug acquisition costs." The Consulting Services Agreement specified that Opalich would work up to twenty (20) hours a month for the Crevice Affiliate in exchange for a monthly consulting fee of $8,000. Opalich never disclosed this Consulting Agreement to EHO, nor did he obtain EHO's authorization to engage in these outside consulting activities or receive outside compensation.

32.    On August 20, 2020, Opalich sent an email to Greene from his EHO email address with the subject line "Financials." Attached to this email were several highly sensitive and confidential documents, including the limited liability company agreement of SPCGT, the limited partnership agreement of another EHO affiliate, and a confidential buy-sell agreement and purchase option.

33.    On August 24, 2020, Opalich caused EHO to enter into a Mutual Non-Disclosure Agreement (the "MNDA") with Crevice. Although the MNDA's stated purpose is to allow EHO and Crevice to share confidential information in furtherance of a potential business transaction, it is clear from Opalich's and Crevice's conduct that the MNDA was actually a sham designed to create the appearance that Opalich's repeated disclosure of EHO's confidential information to Crevice was done for a legitimate purpose.

34.    Shortly after Opalich and Crevice executed the MNDA, Opalich disclosed additional confidential information to Greene, including EHO's financials, the name of a hospice

company with whom EHO had recently started negotiations, and various other confidential and proprietary documents of EHO.

35.    On September 3, 2020, Opalich sent an email to Greene with the subject line "A new business model and program we're launching."   Then, on September 14, 2020, Opalich emailed Greene about a potential investor who Opalich claimed would "be a good partner" and "certainly has the money."  In this email, Opalich also proposed to set up a call between Greene, Opalich, and one of EHO's board members, and he explained to Greene that he wanted to effectively ambush the EHO board member when "he is not prepared or rehearsed or influenced by other board members."

36.    Later on September 14, 2020, Opalich emailed Greene a document entitled "EHO Risk Events," in which he disclosed highly sensitive, confidential, and proprietary information about EHO's business and identified what he believed to be various vulnerabilities with EHO's business model and operations.  In the email to which this document was attached, Opalich also expressed his disdain for one of EHO's founder's sons, who was an employee of EHO, and disclosed that the founder still held a significant interest in the company.  Opalich concluded the email by saying, if he and Greene could "take [the founder] out will make life easier for all as [the founder] is making no further contribution to the growth of the company and [his son] can be an obstacle."

37.    Discovery will undoubtedly reveal that Opalich also disclosed to Crevice EHO's confidential and proprietary information that he had saved in his personal email accounts and on his personal external hard drives.

**E.      EHO Terminates Opalich's Employment, and Opalich Fraudulently Induces EHO to Pay Him More than $70,000 in Severance**

38.      In September 2020, EHO made the decision to terminate Opalich's employment. Although EHO was not aware at the time that Opalich had disclosed and misused the company's confidential and proprietary information as detailed above, multiple other incidences of misconduct and insubordination precipitated his termination.  For instance, EHO discovered that Opalich had misrepresented his capabilities and industry contacts during the hiring process, and that, during his employment with EHO, he had acted outside the scope of his authority and entered into unauthorized contracts that were detrimental to the company.  Further, Opalich frequently became erratic and confrontational with EHO employees and management and threatened violence against members of EHO's board.  Finally, EHO discovered that Opalich had pleaded guilty to felony tax fraud and that he lied about his criminal history under oath in various official documents during the course of his employment.

39.      On November 6, 2020, EHO and Opalich entered into a Confidential Severance and General Waiver Agreement (the "Severance Agreement").  In the Severance Agreement, Opalich expressly represented that he had returned all of EHO's confidential information and he expressly agreed that the restrictive covenants in the Opalich Agreement would survive the termination of his employment.

40.      Also, as a material inducement for EHO to enter into the Severance Agreement, Opalich executed an affidavit in which he admitted that he had copied EHO's confidential information to external hard drives and sent EHO's confidential information to personal email accounts during the course of his employment.  Opalich certified, however, that he did not misuse EHO's confidential information during his employment, that he returned all of EHO's confidential information in his possession, that he destroyed and permanently deleted all of EHO's confidential

information from any personal devices and email accounts, and that he did not disclose any of EHO's confidential information to any third parties.

41.     As EHO later learned, Opalich's representations were false.  Indeed, Opalich had previously disclosed EHO's confidential information to Crevice and, as detailed below, Opalich used EHO's confidential information to form HospisRX to compete with EHO and solicit EHO's clients.  In addition, Opalich never disclosed to EHO that he had been performing consulting services for a Crevice affiliate and receiving outside compensation for those consulting services while he was serving as EHO's Chief Executive Officer.

42.     In reliance on Opalich's representations in the Severance Agreement and affidavit, EHO paid Opalich a one-time $71,108.26 separation payment (the "Separation Payment").

43.     After executing the Severance Agreement and accepting the Separation Payment, Opalich wiped all information from his EHO company computer and reset the computer to its factory settings before returning it to EHO. This spoliation of evidence not only violated the terms of the Opalich Agreement and the Severance Agreement, but it was clearly done for the purpose of concealing Opalich's misconduct during his tenure with EHO.

**F.     Radcliff Ceases to Perform her Duties for EHO and Begins Collecting EHO Client Referrals**

44.     Following the termination of Opalich's employment with EHO, Radcliff remained employed by the company but failed to perform any of her duties or accomplish any of the objectives for which she was hired.  Not only did Radcliff fail to develop a single new client for EHO, but she also jeopardized EHO's relationships with existing clients and became completely unresponsive to EHO's management and other clients.

45.     EHO later learned that Radcliff was performing consulting services for a different company while she was still employed by EHO, and that she failed to pursue numerous client

referrals and new business opportunities for EHO.  Upon information and belief, Radcliff failed to pursue these client referrals and new business opportunities for EHO because she intended to pursue them on behalf of a competing company that she, Opalich, Crevice, and HealthView were planning to form with one of EHO's longtime clients.

**G.    Opalich, Radcliff, Crevice, and HealthView Scheme to Form a Competing Hospice Pharmacy Benefit Management Company with one of EHO's Longtime Clients**

46.    In or about December 2020, shortly after Opalich entered into the Severance Agreement and while he was still bound by the restrictive covenants in the Opalich Agreement, Opalich solicited one of EHO's clients to participate in a new hospice pharmacy benefit management company that Opalich represented he was in the process of forming.  In addition, Opalich contacted an investment company that he learned about from EHO to solicit investments for the new hospice pharmacy benefit management company.  During his conversation with the investment company, Opalich stated that he intended to hire EHO's top sales representative and steal all of EHO's business.

47.    On February 23, 2021, Greene sent an email to Opalich, Radcliff, HealthView's principal, Sandy Roberson, and another individual with the subject line "NewCo Hospice PBM." Greene attached to the email a document entitled "NewCo Hospice PBM Opportunity – Key Considerations."  A true and correct copy of Greene's email and the "Key Considerations" document are attached hereto as <u>Exhibit A</u>.

48.    In the "Key Considerations" document, Greene outlined a plan to "Establish a Hospice PBM entity that can get up and running very quickly to capture existing market opportunities."  The plan was to form a new limited liability company in Ohio or Delaware, with Opalich as the Chief Executive Officer and Radcliff (who, notably, was still employed by EHO) as the President and Chief Operating Officer.  In addition, Greene proposed that the new company

would have a contractual arrangement with one of EHO's longtime clients for "pharmacy network, claims adjudication, and coupon aggregation," which are some of the same services EHO had long provided for this client. Finally, Crevice and HealthView planned to invest $500,000 in the new company for which they would receive a 50% equity interest, and Opalich and Radcliff would be granted an initial common equity stake with the opportunity to earn up to a 45% equity interest in the new company. Finally, EHO's longtime client would be granted a 5% equity interest in the new company as an apparent inducement for the client to cease business with EHO and enter into a contractual arrangement for services from the new company.

**H.    Radcliff Resigns from EHO, and Crevice and HealthView Form HospisRX**

49.    On March 4, 2021, less than ten (10) days after Greene's email regarding a "NewCo Hospice PBM," Radcliff emailed EHO's current Chief Executive Officer stating that she was resigning from EHO and that any questions about her resignation should be directed to her attorney.

50.    On March 11, 2021, counsel for EHO sent cease and desist letters to Radcliff and Opalich, as well as document preservation letters to Crevice and HealthView. In the letter to Crevice, EHO's counsel also requested that Crevice promptly return all of EHO's confidential information pursuant to the terms of the MNDA.

51.    The next day, Crevice and HealthView formed HospisRX as a Delaware limited liability company.

52.    On March 16, 2021, Greene emailed an EHO executive on behalf of Opalich, Radcliff, Crevice, and HealthView. In the email, Greene admitted that Opalich, Radcliff, Crevice, and HealthView were pursuing a new "business venture," but he claimed that the new business venture was not "explicitly focused on competing with EHO."

53.    On March 17, 2021, Greene emailed EHO's counsel and stated: "We have completed our review and believe we are in full compliance with the terms of the MNDA, including provisions relating to destruction, retention and/or return of Confidential Information. Please view the above as certification to this effect." Notably, Greene did not return any of EHO's confidential information nor did he state whether Crevice had actually retained any of EHO's confidential information.

**CAUSES OF ACTION**

**Count 1-Breach of Contract (Against Opalich)**

54.    EHO incorporates by reference paragraphs 1-53 above as if fully set forth here.

55.    The Opalich Agreement is a valid and enforceable contract, and the restrictive covenants contained in the Opalich Agreement are reasonable restrictions that are ancillary to the Opalich Agreement.

56.    EHO is a third-party beneficiary of, and the assignee of all SPCGT's rights under, the Opalich Agreement.

57.    EHO performed its obligations under the Opalich Agreement.

58.    Opalich breached the Opalich Agreement by, among other things, performing consulting services for a Crevice affiliate during his tenure with EHO, disclosing EHO's confidential information and using it for his own and others' benefit, soliciting EHO's clients and employees, participating in a business that is in competition with EHO, and failing to return EHO's confidential information upon the termination of his employment.

59.    Opalich's breach of the Opalich Agreement has caused EHO injury, and his continued breach of the Opalich Agreement threatens EHO with imminent and irreparable harm.

**Count 2-Breach of Fiduciary Duty (Against Opalich)**

60.     EHO incorporates by reference Paragraphs 1-59 above as if fully set forth here.

61.     Opalich and EHO had a fiduciary relationship by virtue of the Opalich Agreement and Opalich's role as the Chief Executive Officer of EHO.

62.     Opalich breached his fiduciary duties to EHO by, among other things, performing consulting services for a Crevice affiliate and accepting undisclosed outside compensation for such services, disclosing EHO's confidential information and using it for his own and others' benefit, soliciting EHO's clients and employees, and forming a business to compete with EHO.

63.     Opalich's breach of fiduciary duties has caused injury to EHO and resulted in ill-gotten benefits to Opalich.

**Count 3-Fraudulent Inducement (Against Opalich)**

64.     EHO incorporates by reference Paragraphs 1-63 above as if fully set forth here.

65.     Opalich made multiple material false representations to induce EHO to enter into the Severance Agreement, including that: (a) he did not misuse EHO's confidential information during his employment; (b) he returned all of EHO's confidential information in his possession; (c) he destroyed and permanently deleted all of EHO's confidential information from any personal devices and email accounts; and (d) he did not share or disclose any of EHO's confidential information to any third parties.

66.     At the time Opalich made these representations to EHO, he knew they were false.

67.     Opalich made these false representations with the intent that EHO would act on them by entering into the Severance Agreement and paying Opalich the $71,108.26 Separation Payment.

68.    EHO reasonably relied on these representations in entering into the Severance Agreement and paying Opalich the $71,108.26 Separation Payment.

69.    EHO suffered injury as a result of Opalich's false representations, including by making the $71,108.26 Separation Payment to Opalich.

**Count 4-Breach of Contract (Against Radcliff)**

70.    EHO incorporates by reference Paragraphs 1-69 above as if fully set forth here.

71.    The Radcliff Agreement is a valid and enforceable contract, and the restrictive covenants contained in the Radcliff Agreement are reasonable restrictions that are ancillary to the Radcliff Agreement.

72.    EHO is a party to, and performed all of its obligations under, the Radcliff Agreement.

73.    Radcliff breached the Radcliff Agreement by, among other things, performing consulting services for a third-party and receiving undisclosed outside compensation, participating in a company that is in competition with EHO, and using EHO's confidential information to solicit EHO's clients and potential clients.

74.    Radcliff's breach of the Radcliff Agreement has caused EHO injury, and her continued breach of the Radcliff Agreement threatens EHO with imminent and irreparable harm.

**Count 5-Breach of Fiduciary Duty (Against Radcliff)**

75.    EHO incorporates by reference Paragraphs 1-74 above as if fully set forth here.

76.    Radcliff and EHO had a fiduciary relationship by virtue of the Radcliff Agreement and Radcliff's position as an executive of EHO.

77.    Radcliff breached her fiduciary duties by, among other things, performing consulting services for a third-party and receiving undisclosed outside compensation, participating

in a company that is in competition with EHO, and using EHO's confidential information to solicit EHO's clients and potential clients.

78.     Radcliff's breach of fiduciary duties has caused injury to EHO and resulted in ill-gotten benefits to Radcliff.

**Count 6-Tortious Interference (Against Crevice, HealthView, and HospisRX)**

79.     EHO incorporates by reference Paragraphs 1-78 above as if fully set forth here.

80.     EHO had valid and enforceable contracts with Opalich, Radcliff, and its clients.

81.     Crevice, HealthView, and HospisRX had knowledge of EHO's contracts, and willfully and intentionally interfered with those contracts.

82.     Crevice's, HealthView's, and HospisRX's interference with EHO's contracts has caused EHO actual injury, and their continued interference with EHO's contracts threatens EHO with imminent and irreparable injury.

**Count 7-Exemplary Damages (Against All Defendants)**

83.     EHO incorporates by reference Paragraphs 1-82 above as if fully set forth here.

84.     Defendants' tortious acts as set forth above were committed knowingly, willfully, intentionally, and with actual malice.  Accordingly, EHO is entitled to recover exemplary damages from Defendants pursuant to Chapter 41 of the Texas Civil Practice & Remedies Code.

**Count 8-Attorneys' Fees (Against Opalich and Radcliff)**

85.     EHO incorporates by reference Paragraphs 1-84 above as if fully set forth here.

86.     EHO is entitled to recover attorneys' fees from Opalich and Radcliff pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code.

87.     In addition, EHO is entitled to recover attorneys' fees from Opalich pursuant to Paragraph 24 of the Severance Agreement.

**Count 9-Injunctive Relief (Against All Defendants)**

88.     EHO incorporates by reference Paragraphs 1-87 above as if fully set forth here.

89.     EHO is likely to succeed on the merits of its claims against the Defendants.

90.     Absent injunctive relief prohibiting Opalich and Radcliff from breaching their restrictive covenants, and prohibiting all Defendants from using EHO's confidential information to unfairly compete with EHO, EHO will suffer irreparable injury for which there is no adequate remedy at law.

91.     The irreparable injury EHO will suffer if Defendants are not enjoined significantly outweighs any hardships Defendants would face if an injunction is granted.

92.     Injunctive relief prohibiting Opalich and Radcliff from breaching their restrictive covenants, and prohibiting all Defendants from using EHO's confidential information to unfairly compete with EHO, is in the public interest.

**JURY DEMAND**

93.     EHO demands a jury trial of its claims stated herein.

**PRAYER**

94.     For the reasons set forth herein, EHO respectfully requests that:

a.     The Court enter a preliminary injunction prohibiting Opalich and Radcliff from breaching their restrictive covenants, and prohibiting all Defendants from using EHO's confidential information to unfairly compete with EHO, pending a final trial on the merits of EHO's claims;

b.     Upon a final trial on the merits, the Court enter a permanent injunction prohibiting Defendants from using EHO's confidential information to unfairly compete with EHO;

c.     Upon a final trial on the merits, EHO receive a judgment against Defendants for all actual and consequential damages, equitable relief, including disgorgement of Opalich's and Radcliff's ill-gotten benefits, exemplary damages, attorneys' fees and costs, and pre-judgment and post-judgment interest requested herein; and

d.     The Court award EHO all other and further relief, at law or in equity, to which EHO may show itself justly entitled.

Dated: March 29, 2021                          Respectfully submitted,

By:*/s/ Lucas C. Wohlford*
James Beausoleil, Jr. (PA Bar No. 74308)
*Pro Hac Vice Application Forthcoming*
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
Telephone: (215) 979-1120
Fax: (215) 689-0889
Email: JLBeausoleil@duanemorris.com

Corey M. Weideman (TX Bar No. 24056505)
DUANE MORRIS LLP
1330 Post Oak Blvd., Suite 800
Houston, TX 77056
Telephone: (713) 402-3904
Fax: (713) 583-0940
Email: CMWeideman@duanemorris.com

Lucas C. Wohlford (TX Bar No. 24070871)
DUANE MORRIS LLP
100 Crescent Court, Suite 1200
Dallas, TX 75201
Telephone: (214) 257-7214
Fax: (214) 853-5271
Email: LWohlford@duanemorris.com

***Attorneys for Plaintiff EHO360, LLC***