UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

EHO360, LLC,                          §
                                      §
    Plaintiff,                        §
                                      §
v.                                    §      CIVIL ACTION NO. 3:21-CV-0724-B
                                      §
NICHOLAS OPALICH and TAMMY            §
RADCLIFF,                             §
                                      §
    Defendants.                       §

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff EHO360, LLC ("Plaintiff")'s Motion for Preliminary Injunction

(Doc. 13) against Defendants Nicholas Opalich ("Opalich"), Tammy Radcliff ("Radcliff"), Crevice

Capital Partners, LLC ("Crevice"), HealthView Capital Partners, LLC ("HealthView"), and

HospisRX, LLC ("HospisRX").[1] At a hearing held on July 16, 2021, the Court **DENIED** the motion

for preliminary injunction. This Order further details the Court's reasoning.

## I.

## BACKGROUND

A.   *Factual Background*

This is a dispute arising from two high-level executives' alleged involvement in a business

venture competing with their former employer. Plaintiff, a Texas limited-liability company (LLC),

is a "prescription claims processor and pharmacy benefit manager focusing on administering

---

[1] The Court refers to Crevice, HealthView, and HospisRX collectively as "the Entity Defendants" for purposes of brevity. Nevertheless, as noted below, the Court held that it lacks personal jurisdiction over Crevice, HealthView, and HospisRX, so they are not currently defendants in this lawsuit.

prescription claims for," among other clients, "hospice programs, health maintenance organizations, third party administrators, preferred provider organizations, [and] other pharmacy benefit management companies[.]" Doc. 5, Am. Compl., ¶¶ 2, 13.[2]  Plaintiff's services include "designing and implementing pharmacy plans and performing ongoing administration of pharmacy plans." *Id.* ¶ 13.

     1.    <u>The Opalich Agreement</u>

On February 1, 2019, Plaintiff hired Opalich as Chief Executive Officer (CEO) pursuant to an employment agreement ("the Opalich Agreement"). *Id.* ¶¶ 15, 17. The Opalich Agreement contains covenants that "Opalich expressly agreed 'are reasonable and properly required for the adequate protection of [Plaintiff] and its affiliates.'" *Id.* ¶ 17.

Specifically, Opalich agreed that during his employment with Plaintiff, he would "'devote his full-time attention and energies to the performance of his duties as an executive of [Plaintiff]' and to 'devote his best efforts, business judgment, skill and knowledge exclusively to the advancement of the business interests of'" Plaintiff. *Id.* ¶ 16.  Further, he agreed that he would not "cause [Plaintiff] or any of its affiliates to . . . enter into any contract" "without the consent of a Manager of" Plaintiff. Doc. 17-1, Defs.' App., 2. Additionally, Opalich agreed that while serving as CEO, he would "keep all Confidential Information in a fiduciary capacity for the sole benefit of [Plaintiff] and its affiliates" and return confidential information upon termination. *Id.* at 8.

Section 9 of the Opalich Agreement also contains several relevant "[p]ost-[t]ermination" covenants. *See id.* at 7–8. First, Opalich agreed that for five years "immediately after the termination

---

[2] Throughout this Order, "PBM" means pharmacy benefit manager or pharmacy benefit managing.

of his employment for any reason," he would not disclose or use Plaintiff's confidential information

for any purpose, such as to solicit business for the provision of services similar to those of Plaintiff.

*Id.* at 8. Additionally, Opalich signed nonsolicitation and noncompete covenants that were triggered

"after the termination of his employment for any reason[.]" *Id.* The nonsolicitation and noncompete

covenants prohibited Opalich from, among other things, "solicit[ing] . . . any Account for the

purpose of selling or providing to the Account products or services of the same or similar kind as

provided by [Plaintiff] and its affiliates" and "becom[ing] interested in a Person engaged in a business

that is the same or similar to [Plaintiff's business] . . . in any . . . capacity, for any purpose prohibited

by [the nonsolicitation covenant.]" *Id.* at 8–9.

The nonsolicitation and noncompete covenants endure "for a period of time equal to the

period during which [Opalich] is receiving payments under Section 4[d] equal to the Annual Base

Salary[.]" *Id.* at 8. Section 4[d] provides that if Opalich is terminated without cause or resigns for

good reason:

> then during the 12-month period commencing on the date of such termination (or
> such shorter period equal to the remainder of the [term of Opalich Agreement] if
> such termination occurs when there is less than [twelve] months remaining in the
> [t]erm), [Opalich] shall be entitled to receive the annual Base Salary, in each case
> payable by [Plaintiff] in regular installments in accordance with [Plaintiff's] general
> payroll practices[.]

*Id.* at 3.

2.    The Radcliff Agreement

"On or about July 1, 2020, [Plaintiff] hired Radcliff to serve as its Executive Vice President

of Hospice PBM Division pursuant to an Employment Agreement (the 'Radcliff Agreement')." Doc.

5, Am. Compl., ¶ 22. The Radcliff Agreement contains a few covenants relevant here. First, Radcliff

agreed to "devote [her] full business energies, interest, abilities and productive time to the proper and efficient performance of [her] duties[.]" Doc. 17-1, Defs.' App., 31. Additionally, she agreed that for twelve months following her termination, she would not "use confidential information to solicit or attempt to solicit the business of any client or customer of [Plaintiff] with respect to products, services, or investments similar to those provided or supplied by" Plaintiff. *Id.* at 32. She also agreed that "[d]uring" her employment with Plaintiff, she would not "acquire, assume or participate in, directly or indirectly, any position, investment or interest known by Executive to be adverse or antagonistic to [Plaintiff], or in any company, person, or entity that is, directly or indirectly, in competition with" Plaintiff. *Id.* at 31–32.

    **3.**      The alleged misconduct and formation of HospisRX

    Plaintiff alleges several instances of misconduct by Opalich and Radcliff during and after their terms of employment.

    First, "from February 2019 through September 2020, Opalich forwarded dozens of emails containing [Plaintiff's] confidential information to his personal email accounts." Doc. 5, Am. Compl., ¶ 28. After sending confidential information to his personal accounts, "Opalich sent an email from his [work] email address to Stephen Greene, the Managing Member of Crevice, with the subject line 'Personal & Confidential.'" *Id.* ¶ 29. Plaintiff alleges that in the email, "Opalich disclosed to Greene confidential information he had learned while working for" Plaintiff. *Id.*[3] This email initiated "a series of communications between Opalich and Greene, in which Opalich repeatedly disclosed EHO's confidential information to Greene[.]" *Id.* For example, Plaintiff alleges Opalich sent Greene an email

---

[3] Defendants contend this information was public. Doc. 16, Defs.' Br., 20–21.

containing "several highly sensitive and confidential documents" on August 20, 2020. *Id.* ¶ 32. Plaintiff alleges that four days later, "Opalich caused [Plaintiff] to enter into a Mutual Non-Disclosure Agreement (the 'MNDA') with Crevice," which was a "sham" agreement "designed to create the appearance that Opalich's repeated disclosure of [Plaintiff's] confidential information to Crevice was done for a legitimate purpose." *Id.* ¶ 33. Plaintiff claims Opalich lacked a manager's consent to enter the MNDA. Doc. 13, Pl.'s Mot., 9. Defendants, however, suggest that Opalich entered the MNDA "on Plaintiff's behalf in pursuit of a potential acquisition." Doc. 20, Defs.' Resp., 17. After execution of the MNDA, Opalich disclosed more confidential information to Greene, including Plaintiff's financials, a hospice company that Plaintiff had been negotiating with, and confidential documents of Plaintiff. Doc. 5, Am. Compl., ¶¶ 33–36.

Additionally, Plaintiff alleges that "on August 17, 2020, Opalich sent Radcliff a draft Consulting Services Agreement between himself and a Crevice affiliate and directed Radcliff to '[b]e creative.'" *Id.* ¶ 31. But "Opalich never disclosed" any consulting arrangement to Plaintiff. *Id.* ¶ 41.

Although unaware of the misconduct detailed above, Plaintiff terminated Opalich's employment in September 2020. *Id.* ¶ 38. On November 6, 2020, Opalich and Plaintiff entered a severance agreement ("the Severance Agreement") that required Plaintiff to pay Opalich a one-time separation payment of $71,108.26. *Id.* ¶¶ 39, 42. As part of the Severance Agreement, Opalich submitted an affidavit admitting he had copied Plaintiff's confidential information to external hard drives and emailed it to personal email accounts during his employment. *Id.* ¶ 40. But he "certified . . . that he did not misuse [Plaintiff's] confidential information" or disclose it to third parties and that he had returned, destroyed, and deleted any confidential information of Plaintiff. *Id.* After the execution of the Severance Agreement, Opalich "wiped all information from his . . . company

computer and reset the computer to its factory settings before returning it to [Plaintiff.]" *Id.* ¶ 43.

Following Opalich's termination, Plaintiff alleges that in "December 2020, . . . Opalich solicited one of EHO's clients [(Ascend)] to participate in a new hospice pharmacy benefit management company that Opalich represented he was in the process of forming." *Id.* ¶ 46. In addition, Plaintiff alleges "Opalich stated that he intended to hire [Plaintiff's] top sales representative and steal all of [Plaintiff's] business." *Id.*

Then, on February 23, 2021, Greene—managing member of Crevice, the entity with which Opalich had entered the MNDA—"sent an email to Opalich, Radcliff," the principal of HealthView, "and another individual with the subject line 'NewCoHospice PBM'" (hereinafter "the Email"). *Id.* ¶ 47.[4] Attached to the Email was a document titled "NewCo Hospice PBM Opportunity - Key Considerations." *Id.* In the attachment, Greene explained a plan to create a PBM entity in which Opalich would serve as CEO and Radcliff would serve as President and Chief Operating Officer. *Id.* ¶ 48. Crevice and HealthView would be investors in the new venture and receive a fifty-percent equity interest. *Id.* The plan also mentions a "[c]ontractual arrangement with" Ascend, one of Plaintiff's clients, "for pharmacy network, claims adjudication and coupon aggregation at [$1.00] per claim." Doc. 5-1, Ex. to Am. Compl., 3. Plaintiff alleges these "are some of the same services [Plaintiff] had long provided for" Ascend. Doc. 5, Am. Compl., ¶ 48. Plaintiff thus maintains that Defendants were attempting to steal Ascend's business from Plaintiff by offering Ascend services similar to those of Plaintiff but for a lower price. Further, the plan provided Ascend with a five-percent equity interest "as an apparent inducement for [Ascend] to cease business with

---

[4] Greene inadvertently sent the Email to Opalich's email account with Plaintiff. Doc. 16, Defs.' Br., 1.

[Plaintiff] and enter into a contractual arrangement" with the new company. *Id.* Defendants, however, provide a declaration from Ascend's CEO, which states that he has "not been approached" by any Defendants "to cease doing any business with [Plaintiff] for any purpose." Doc. 21, Defs.' App., 76. Further, at the hearing, Plaintiff conceded that Ascend continues to conduct business with Plaintiff.

On March 4, 2021, Radcliff emailed Plaintiff's current CEO to resign from her position with Plaintiff. *Id.* ¶ 49. According to Plaintiff, an internal review of Radcliff's email account with Plaintiff "revealed that she had sent Confidential Information to external email addresses while she was employed by [Plaintiff], failed to pursue or follow up on numerous client referrals and new business opportunities, and appeared to be performing consulting services for a different company while still employed by" Plaintiff. Doc. 13-1, Pl.'s App., 7.

Then, on March 12, 2021, Crevice and HealthView formed the new PBM entity—HospiceRX—as a Delaware LLC. Doc, 5. Am. Compl., ¶ 51. A few days later, Greene emailed Plaintiff "on behalf of Opalich, Radcliff, Crevice, and Healthview," explaining that though they were all "pursuing a new 'business venture,'" the venture "was not 'explicitly focused on competing with'" Plaintiff. *Id.* ¶ 52. According to a declaration from Greene, "Chairperson of the Board of Directors of HospisRX," HospisRX is not presently operational. Doc. 17-1, Defs.' App., 65. Nevertheless, Plaintiff maintains that HospisRX is operating to at least some extent—Plaintiff offered to provide the Court with a recent email exchange in which Radcliff held herself out as "President" of HospisRX, as well as evidence that HospisRX maintains a website.

B.    *Procedural Background*

Plaintiff filed suit in this Court on March 29, 2021. *See generally* Doc. 1, Compl. In its

- 7 -

operative complaint, Plaintiff asserts the following claims: (1) breach of contract against Opalich and Radcliff, Doc. 5, Am. Compl., ¶¶ 54–59, 70–74; (2) breach of fiduciary duty against Opalich and Radcliff, *id.* ¶¶ 60–63, 75–78; (3) fraudulent inducement against Opalich, *id.* ¶¶ 64–69; and (4) tortious interference with contract against the Entity Defendants. *Id.* ¶¶ 79–82.

On May 19, 2021, Plaintiff filed its motion for preliminary injunction (Doc. 13). In its motion, Plaintiff asks the Court to enter an order:

> (1) enjoining and prohibiting [Opalich] from disclosing or using EHO's confidential information, soliciting or attempting to solicit business from any EHO client or prospective client, or rendering services to any person engaged in the same or similar business as EHO in violation of his restrictive covenants;
>
> (2) enjoining and prohibiting [Radcliff] from disclosing or using EHO's confidential information in violation of her restrictive covenants; and
>
> (3) enjoining and prohibiting the [Entity Defendants] from using EHO's confidential information to solicit EHO's clients or prospective clients or for any other purpose.

Doc. 13, Pl.'s Mot., 1. After the motion was fully briefed, the Court set a hearing for consideration of the motion. Plaintiff then filed a motion for expedited discovery (Doc. 26) on the merits of its motion for preliminary injunction and the issue of personal jurisdiction. After receiving a response from Defendants (Doc. 30), the Court denied Plaintiff's motion for expedited discovery.

On July 16, 2021, the Court held a hearing for consideration of the merits of Plaintiff's motion for preliminary injunction. Before doing so, the Court ruled that it lacks personal jurisdiction over the Entity Defendants. Then, upon hearing oral argument and permitting the presentation of evidence, the Court denied Plaintiff's motion for a preliminary injunction without prejudice. Below, the Court further explains the reasoning for its holding.

## II.

## LEGAL STANDARD

"Injunctive relief is an extraordinary and drastic remedy, and should only be granted when the movant has clearly carried the burden of persuasion." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (quotation marks and citation omitted). To obtain a preliminary injunction, a plaintiff must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that it will suffer irreparable injury absent the injunction; (3) that the threatened injury outweighs any harm the injunction might cause the defendants; and (4) that the injunction will not impair the public interest." *Enrique Bernat F., S.A. v. Guadalajara, Inc.*, 210 F.3d 439, 442 (5th Cir. 2000) (citation omitted).

## III.

## ANALYSIS

The Court holds that Plaintiff has not shown a substantial threat of irreparable harm.[5] To establish irreparable harm, Plaintiff must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *TRAVELHOST, Inc. v. Figg*, 2011 WL 6009096, at *4 (N.D. Tex. Nov. 22, 2011) (citing *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986)). This is a heavy burden to overcome, and mere speculative injury will not suffice. *Id.*

Plaintiff contends it has established irreparable harm by showing that Opalich and Radcliff possess Plaintiff's confidential information and are now forming a competing company. Doc. 13, Pl.'s

---

[5] As a result, the Court need not consider the remaining elements for injunctive relief.

Mot., 23–24. In support, Plaintiff points out that Opalich disclosed Plaintiff's confidential information to Crevice; downloaded confidential information to his personal external hard drives and email accounts while employed with Plaintiff; and wiped his computer provided by Plaintiff before returning it upon termination. *See id.*; Doc. 13-1, Pl.'s App., 4, 6–7, 53, 91. Plaintiff also asserts that Radcliff sent confidential information "to external email addresses while she was employed by [Plaintiff]" and that Ascend, as Plaintiff's client, has "access to [Plaintiff's] most sensitive and valuable confidential and proprietary information." Doc. 13-1, Pl.'s App., 7; Doc. 13, Pl.'s Mot., 24. At the hearing, Plaintiff also explained that Radcliff was negotiating a human resources contract on behalf of HospisRX, thereby suggesting that HospisRX—a potential competitor of Plaintiff—is operational.

Additionally, Plaintiff asserts that Ascend "has already breached its payment obligations to" Plaintiff. Doc. 13, Pl.'s Mot., 24. At the hearing, however, Plaintiff conceded that Ascend is still conducting business with Plaintiff.[6]

In response, Defendants emphasize that any harm contemplated by Plaintiff is speculative— "Plaintiff expresses only a fear or apprehension that it might be injured[.]" Doc. 20, Defs.' Resp., 23. Further, Defendants point out that any harm suffered by Ascend's failure to timely pay Plaintiff is "easily calculable[.]" *Id.* (citation omitted).

---

[6] Plaintiff also appears to rely upon Opalich's alleged breach of his noncompete and nonsolicitation covenants to establish irreparable harm. *See* Doc. 13, Pl.'s Mot., 23 (stating that "injury resulting from the breach of non-compete covenants is the epitome of irreparable injury" (citations omitted)). But as noted at the hearing, the Court has not determined that these covenants survived beyond the one-time severance payment in November 2020. Indeed, the Opalich Agreement states that the noncompete and nonsolicitation covenants survive only "for a period of time equal to the period during which [Opalich] is receiving payments under Section 4[d] equal to the Annual Base Salary[.]" Doc. 17-1, Defs.' App., 8. The parties agree that Opalich did not receive any severance payment from Plaintiff after November 2020. There is thus not a substantial likelihood of irreparable harm based on a breach of the noncompete or nonsolicitation covenant.

- 10 -

Based on the current record, the Court agrees with Defendants. As Plaintiff conceded at the hearing, it has no evidence that is has actually lost customers to HospisRX. Nor did Plaintiff present any other evidence indicating that Defendants are currently using—or even currently in possession of—Plaintiff's confidential information. At the hearing, Plaintiff stated it could present evidence that Opalich has a "pattern" of failing to destroy confidential information in order to suggest that Opalich still possesses Plaintiff's confidential information. But even if the Court were to draw the inference that Opalich possesses Plaintiff's confidential information, Plaintiff still has not presented any evidence he is using that information. Rather, Plaintiff premises its irreparable-harm allegation on the notion that HospisRX *could* use Plaintiff's confidential information. This suspicion does not give rise to a substantial threat of imminent, irreparable harm. *See, e.g.*, *Snelling & Snelling, Inc., v. Ryvis, Inc.*, 1999 WL 1032799, at *2 (N.D. Tex. Nov. 10, 1999) (rejecting plaintiff's assertion that it would suffer irreparable harm where defendants had "obtained confidential information from" plaintiff because plaintiff could not "establish that it is currently losing customers" or "that defendants are using confidential information to [plaintiff's] detriment"). *Cf. Brink's Inc. v. Patrick*, 2014 WL 2931824, at *7 (N.D. Tex. June 27, 2014) (finding threat of irreparable harm where defendant took a position with a competitor and then accessed his former employer's confidential information while subject to a noncompete clause); *CyberX Grp., LLC v. Pearson*, 2021 WL 1966813, at *10–11 (N.D. Tex. May 17, 2021) (finding irreparable harm where plaintiff provided evidence of the "competitive disadvantage" it faced due to defendants' actions, including defendants' active competition and attempts to divert plaintiff's potential clients).

As Plaintiff pointed out at the hearing, it stands in a unique position: Plaintiff filed this lawsuit when HospisRX—the alleged competitor—was newly formed. Should Plaintiff discover new

evidence warranting a preliminary injunction during the course of discovery, it may again move for a preliminary injunction. For now, however, the Court holds Plaintiff has not demonstrated irreparable harm and thus **DENIES** Plaintiff's motion for a preliminary injunction.

## IV.

## CONCLUSION

For the reasons stated above, as well as those provided at the July 16, 2021, hearing, the Court **DENIED** Plaintiff's motion for preliminary injunction (Doc. 13).

SO ORDERED.

SIGNED: July 20, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE