UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EHO360, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-0724-B |
| | § | |
| NICHOLAS OPALICH and TAMMY | § | |
| RADCLIFF, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Nicholas Opalich ("Opalich"), Tammy Radcliff ("Radcliff"), Crevice Capital Partners, LLC ("Crevice"), HealthView Capital Partners, LLC ("HealthView"), and HospisRX, LLC ("HospisRX")'s Motion to Dismiss (Doc. 15). In the motion, all Defendants moved to dismiss Plaintiff EHO360, LLC ("Plaintiff")'s claims for failure to state a claim; additionally, Crevice, HealthView, and HospisRX (collectively, "the Entity Defendants") moved to dismiss the claim against them for lack of personal jurisdiction. At a hearing held on July 16, 2021, the Court **GRANTED** the motion to the extent the Entity Defendants sought dismissal of the claim against them for lack of personal jurisdiction. This Order further details the Court's reasoning.

## I.

## BACKGROUND

### A.    *Factual Background*

This dispute arises from two high-level executives' alleged involvement in a business venture competing with their former employer. Plaintiff, a Texas limited-liability company (LLC), is a

"prescription claims processor and pharmacy benefit manager focusing on administering prescription claims for," among other clients, "hospice programs, health maintenance organizations, third party administrators, preferred provider organizations, [and] other pharmacy benefit management companies[.]" Doc. 5, Am. Compl., ¶¶ 2, 13.[1]   Plaintiff's services include "designing and implementing pharmacy plans and performing ongoing administration of pharmacy plans." *Id.* ¶ 13.

    1.    <u>The Opalich Agreement</u>

On February 1, 2019, Plaintiff hired Opalich as Chief Executive Officer (CEO) pursuant to an employment agreement ("the Opalich Agreement"). *Id.* ¶ 15. The Opalich Agreement contains covenants that "Opalich expressly agreed 'are reasonable and properly required for the adequate protection of [Plaintiff] and its affiliates.'" *Id.* ¶ 17.

Specifically, Opalich agreed that during his employment with Plaintiff, he would "'devote his full-time attention and energies to the performance of his duties as an executive of [Plaintiff]' and . . . 'devote his best efforts, business judgment, skill and knowledge exclusively to the advancement of the business interests of'" Plaintiff. *Id.* ¶ 16.   Further, he agreed that he would not "cause [Plaintiff] or any of its affiliates to . . . enter into any contract" "without the consent of a Manager of" Plaintiff. Doc. 17-1, Defs.' App., 2. Additionally, Opalich agreed that while serving as CEO, he would "keep all Confidential Information in a fiduciary capacity for the sole benefit of [Plaintiff] and its affiliates" and return confidential information upon termination. *Id.* at 8.

Section 9 of the Opalich Agreement also contains several relevant "[p]ost-[t]ermination" covenants. *See id.* at 7–8. First, Opalich agreed that for five years "immediately after the termination

---

[1] Throughout this Order, "PBM" means pharmacy benefit manager or pharmacy benefit managing.

of his employment for any reason," he would not disclose or use Plaintiff's confidential information for any purpose, such as to solicit business for the provision of services similar to those of Plaintiff. *Id.* at 8. Additionally, Opalich signed nonsolicitation and noncompete covenants that were triggered "after the termination of his employment for any reason[.]" *Id.* The nonsolicitation and noncompete covenants prohibited Opalich from, among other things, "solicit[ing] . . . any Account for the purpose of selling or providing to the Account products or services of the same or similar kind as provided by [Plaintiff] and its affiliates" and "becom[ing] interested in a Person engaged in a business that is the same or similar to [Plaintiff's business] . . . in any . . . capacity, for any purpose prohibited by [the nonsolicitation covenant.]" *Id.* at 8–9.

The nonsolicitation and noncompete covenants endure "for a period of time equal to the period during which [Opalich] is receiving payments under Section 4[d] equal to the Annual Base Salary[.]" *Id.* at 8. Section 4[d] provides that if Opalich is terminated without cause or resigns for good reason:

> then during the 12-month period commencing on the date of such termination (or such shorter period equal to the remainder of the [term of the Opalich Agreement] if such termination occurs when there is less than [twelve] months remaining in the [t]erm), [Opalich] shall be entitled to receive the annual Base Salary, in each case payable by [Plaintiff] in regular installments in accordance with [Plaintiff's] general payroll practices[.]

*Id.* at 3.

2.    The Radcliff Agreement

"On or about July 1, 2020, [Plaintiff] hired Radcliff to serve as its Executive Vice President of Hospice PBM Division pursuant to an Employment Agreement (the 'Radcliff Agreement')." Doc. 5, Am. Compl., ¶ 22. The Radcliff Agreement contains a few covenants relevant here. First, Radcliff

agreed to "devote [her] full business energies, interest, abilities and productive time to the proper and efficient performance of [her] duties[.]" Doc. 17-1, Defs.' App., 31. Additionally, she agreed that for twelve months following her termination, she would not "use confidential information to solicit or attempt to solicit the business of any client or customer of [Plaintiff] with respect to products, services, or investments similar to those provided or supplied by" Plaintiff. *Id.* at 32. She also agreed that "[d]uring" her employment with Plaintiff, she would not "acquire, assume or participate in, directly or indirectly, any position, investment or interest known by [her] to be adverse or antagonistic to [Plaintiff], or in any company, person, or entity that is, directly or indirectly, in competition with" Plaintiff. *Id.* at 31–32.

      <u>3.</u>      <u>The alleged misconduct and formation of HospisRX</u>

      Plaintiff alleges several instances of misconduct by Opalich and Radcliff during and after their terms of employment.

      First, "from February 2019 through September 2020, Opalich forwarded dozens of emails containing [Plaintiff's] confidential information to his personal email accounts." Doc. 5, Am. Compl., ¶ 28. After sending confidential information to his personal accounts, "Opalich sent an email from his [work] email address to Stephen Greene, the Managing Member of Crevice, with the subject line 'Personal & Confidential.'" *Id.* ¶ 29. Plaintiff alleges that in the email, "Opalich disclosed to Greene confidential information he had learned while working for" Plaintiff. *Id.*[2] This email initiated "a series of communications between Opalich and Greene, in which Opalich repeatedly disclosed [Plaintiff's] confidential information to Greene[.]" *Id.* For example, Plaintiff alleges Opalich sent Greene an email

---

[2] Defendants contend this information was public. Doc. 16, Defs.' Br., 20–21.

containing "several highly sensitive and confidential documents" on August 20, 2020. *Id.* ¶ 32. Plaintiff alleges that four days later, "Opalich caused [Plaintiff] to enter into a Mutual Non-Disclosure Agreement (the 'MNDA') with Crevice," which was a "sham" agreement "designed to create the appearance that Opalich's repeated disclosure of [Plaintiff's] confidential information to Crevice was done for a legitimate purpose." *Id.* ¶ 33. Plaintiff claims Opalich lacked a manager's consent to enter the MNDA. Doc. 13, Pl.'s Mot., 9. Defendants, however, suggest that Opalich entered the MNDA "on Plaintiff's behalf in pursuit of a potential acquisition." Doc. 20, Defs.' Resp., 17. After execution of the MNDA, Opalich disclosed more confidential information to Greene, including Plaintiff's financials, the name of a hospice company that Plaintiff had been negotiating with, and confidential documents of Plaintiff. Doc. 5, Am. Compl., ¶¶ 33–36.

Additionally, Plaintiff alleges that "[o]n August 17, 2020, Opalich sent Radcliff a draft Consulting Services Agreement between himself and a Crevice affiliate and directed Radcliff to '[b]e creative.'" *Id.* ¶ 31. But "Opalich never disclosed" any consulting arrangement to Plaintiff. *Id.* ¶ 41.

Although unaware of the misconduct detailed above, Plaintiff terminated Opalich's employment in September 2020. *Id.* ¶ 38. On November 6, 2020, Opalich and Plaintiff entered a severance agreement ("the Severance Agreement") that required Plaintiff to pay Opalich a one-time separation payment of $71,108.26. *Id.* ¶¶ 39, 42. As part of the Severance Agreement, Opalich submitted an affidavit admitting he had copied Plaintiff's confidential information to external hard drives and emailed it to personal email accounts during his employment. *Id.* ¶ 40. But he "certified . . . that he did not misuse [Plaintiff's] confidential information" or disclose it to third parties and that he had returned, destroyed, and deleted any confidential information of Plaintiff. *Id.* After the execution of the Severance Agreement, Opalich "wiped all information from his . . . company

computer and reset the computer to its factory settings before returning it to [Plaintiff.]" *Id.* ¶ 43.

Following Opalich's termination, Plaintiff alleges that in "December 2020, . . . Opalich solicited one of [Plaintiff's] clients [(Ascend)] to participate in a new hospice pharmacy benefit management company that Opalich represented he was in the process of forming." *Id.* ¶ 46. In addition, Plaintiff claims "Opalich stated that he intended to hire [Plaintiff's] top sales representative and steal all of [Plaintiff's] business." *Id.*

Opalich explains in a declaration that the idea of forming a hospice PBM company "was raised" in a phone call between Opalich and Greene (Managing Member of Crevice) in January 2021. Doc. 21, Defs.' App., 31. After they had a "follow-up call," Greene introduced Opalich to Sandy Roberson, the President of HealthView, on February 9, 2021. *Id.* That same day, Opalich invited Radcliff to join his phone call with Roberson. *Id.*[3] A week later, Greene, Roberson, Radcliff, Opalich, and Ascend's CEO had a conference call in which they "discussed the possibility of using Ascend to provide operational support services for the hospice PBM company [they] were contemplating." *Id.* Subsequently, Greene, Roberson, Radcliff, and Opalich had a call to discuss the design of the new company. *Id.*

The next day, Greene "sent an email to Opalich, Radcliff, HealthView's [President], Sandy Roberson, and another individual with the subject line 'NewCo Hospice PBM'" (hereinafter "the Email"). Doc. 5, Am. Compl., ¶ 47.[4] Attached to the Email was a document titled "NewCo Hospice

---

[3] Radcliff states in a declaration that she "had no prior relationship" with Greene or Roberson "prior to February 9, 2021[.]" Doc. 21, Defs.' App., 9.

[4] Greene inadvertently sent the Email to Opalich's work email account with Plaintiff. Doc. 16, Defs.' Br., 1.

PBM Opportunity – Key Considerations." *Id.* In the attachment, Greene outlined a plan to create a PBM entity in which Opalich would serve as CEO and Radcliff would serve as President and Chief Operating Officer. *Id.* ¶ 48. Crevice and HealthView would be investors in the new venture and receive a fifty-percent equity interest. *Id.* The plan also mentions a "[c]ontractual arrangement with" Ascend, one of Plaintiff's clients, "for pharmacy network, claims adjudication and coupon aggregation at [$1.00] per claim." Doc. 5-1, Ex. to Am. Compl., 3. Plaintiff alleges these "are some of the same services [Plaintiff] had long provided for" Ascend pursuant to a contract (hereinafter "the Ascend Agreement"). Doc. 5, Am. Compl., ¶ 48. As explained at the hearing, Plaintiff thus maintains that Defendants were attempting to steal Ascend's business from Plaintiff by offering Ascend similar services at a lower price. The plan also provided Ascend with a five-percent equity interest "as an apparent inducement for [Ascend] to cease business with [Plaintiff] and enter into a contractual arrangement" with the new company. *Id.*

Defendants, however, provided a declaration from Ascend's CEO, which states that he has "not been approached" by any Defendants "to cease doing any business with [Plaintiff] for any purpose." Doc. 21, Defs.' App., 76. Further, at the hearing, Plaintiff conceded that Ascend continues to conduct business with Plaintiff. Finally, Opalich states in his declaration that the HospisRX "business venture has since changed direction and there have been no further conversations" with Ascend's CEO about using Ascend's services since March 18, 2021. *Id.* at 31.

On March 4, 2021, Radcliff emailed Plaintiff's current CEO to resign from her position with Plaintiff. Doc. 5, Am. Compl., ¶ 49. According to Plaintiff, an internal review of Radcliff's email account with Plaintiff "revealed that she had sent Confidential Information to external email addresses while she was employed by [Plaintiff], failed to pursue or follow up on numerous client

referrals and new business opportunities, and appeared to be performing consulting services for a different company while still employed by" Plaintiff. Doc. 13-1, Pl.'s App., 7.

Then, on March 12, 2021, Crevice and HealthView formed the new PBM entity—HospiceRX—as a Delaware LLC. Doc, 5. Am. Compl., ¶ 51. A few days later, Greene emailed Plaintiff "on behalf of Opalich, Radcliff, Crevice, and HealthView," explaining that though they were all "pursuing a new 'business venture,'" the venture "was not 'explicitly focused on competing with'" Plaintiff. *Id.* ¶ 52. According to a declaration from Greene, "Chairperson of the Board of Directors of HospisRX," HospisRX is not presently operational. Doc. 17-1, Defs.' App., 65. Nevertheless, Plaintiff maintains that HospisRX is operating to at least some extent—Plaintiff offered to provide the Court with a recent email exchange in which Radcliff held herself out as "President" of HospisRX, as well as evidence that HospisRX maintains a website.

B.    *Procedural Background*

Plaintiff filed suit in this Court on March 29, 2021. *See generally* Doc. 1, Compl. In its operative complaint, Plaintiff asserts the following claims: (1) breach of contract against Opalich and Radcliff, Doc. 5, Am. Compl., ¶¶ 54–59, 70–74; (2) breach of fiduciary duty against Opalich and Radcliff, *id.* ¶¶ 60–63, 75–78; (3) fraudulent inducement against Opalich, *id.* ¶¶ 64–69; and (4) tortious interference with contract against the Entity Defendants. *Id.* ¶¶ 79–82.

On May 19, 2021, Plaintiff filed a motion for preliminary injunction (Doc. 13). Shortly thereafter, Defendants filed a motion to dismiss (Doc. 15). The motion seeks dismissal of all claims for failure to state a claim, as well as dismissal of the claim against the Entity Defendants for lack of personal jurisdiction. Doc. 15, Defs.' Mot., 1. The Court set a hearing for July 16, 2021, to consider the motion to dismiss and motion for preliminary injunction. Doc. 22, Order, 1–2.

Plaintiff then filed a motion for expedited discovery (Doc. 26) on the merits of its motion for preliminary injunction and the issue of personal jurisdiction. After receiving Defendants' response (Doc. 30), the Court denied Plaintiff's motion for expedited discovery.

At the hearing, the Court admitted evidence, heard oral argument, and permitted live-witness testimony. The Court then ruled that it lacks personal jurisdiction over the Entity Defendants and that Plaintiff was not entitled to jurisdictional discovery. Below, the Court further explains the reasoning underlying these holdings.

## II.

## LEGAL STANDARD

A.      *Motion to Dismiss for Lack of Personal Jurisdiction*

A plaintiff bears the burden of establishing a trial court's personal jurisdiction over each defendant. *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). In considering a motion to dismiss for lack of personal jurisdiction, the Court takes the allegations in the plaintiff's complaint "as true except to the extent that they are contradicted by defendant's affidavits." *Int'l Truck & Engine Corp. v. Quintana*, 259 F. Supp. 2d 553, 557 (N.D. Tex. 2003) (citing *Wyatt v. Kaplan*, 686 F.2d 276, 282–83 n.13 (5th Cir. 1982)). In deciding whether the plaintiff has established personal jurisdiction, "[t]he district court may consider the contents of the record at the time of the motion[.]" *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 343–44 (5th Cir. 2002) (citation omitted). "Any genuine, material conflicts between the facts established by the parties' affidavits and other evidence are resolved in favor of plaintiff for the purposes of determining whether a prima facie case exists." *Id.* (citation omitted).

To exercise personal jurisdiction, two preconditions must be met: (1) the nonresident

defendant must be amenable to service of process under the Texas long-arm statute; and (2) the assertion of jurisdiction over the nonresident must comport with the Due Process Clause of the United States Constitution. *Jones v. Petty-Ray Geophysical, Geosource, Inc.*, 954 F.2d 1061, 1067 (5th Cir. 1992). Because the Texas long-arm statute has been held to extend to the limits of the Due Process Clause, the Court need only determine whether jurisdiction over the defendant is constitutionally permissible. *Id.* at 1067–68 (citation omitted).

To satisfy due process, two elements must be met: (1) the defendant must have purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with that state such that it would reasonably anticipate being brought to court there; and (2) the exercise of jurisdiction over the defendant must "comport[] with fair play and substantial justice." *Id.* at 1068 (citations omitted).

The "minimum contacts" prong of the due process analysis can be met through contacts that give rise to either general or specific jurisdiction. *Gundle Lining Constr. Corp. v. Adams Cnty. Asphalt, Inc.*, 85 F.3d 201, 205 (5th Cir. 1996). "General personal jurisdiction is found when the nonresident defendant's contacts with the forum state, even if unrelated to the cause of action, are continuous, systematic, and substantial." *Marathon Oil Co. v. Ruhrgas*, 182 F.3d 291, 295 (5th Cir. 1999). In contrast, specific jurisdiction exists "only when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action." *Gundle*, 85 F.3d at 205.

"Once a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable." *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 102 (5th Cir. 2018) (citation omitted). In determining whether the assertion of jurisdiction is fair, the Court considers:

"(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies." *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 473 (5th Cir. 2006).

## III.

## ANALYSIS

Below, the Court begins by analyzing whether Plaintiff is subject to a *prima facie* burden or the preponderance-of-the-evidence standard in demonstrating personal jurisdiction. The Court first finds that the preponderance standard applies here. Nevertheless, because the Court held at the hearing that Plaintiff failed to meet its burden of establishing personal jurisdiction under either standard, the Court then explains why Plaintiff has not met even its *prima facie* burden of showing personal jurisdiction over the Entity Defendants. Finally, the Court explains why it denied Plaintiff's request for jurisdictional discovery.

A.   *Plaintiff Must Show Personal Jurisdiction by a Preponderance of the Evidence.*

The Court first assesses Plaintiff's burden at this stage of proceedings. If a district court resolves a motion to dismiss for lack of personal jurisdiction without holding a hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction. *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 488 (5th Cir. 2018) (citation omitted). Likewise, the *prima facie* burden remains "[w]hen a district court considers a motion to dismiss, while there is a pending motion for preliminary injunction, without an evidentiary hearing and solely on the basis of affidavits and depositions[.]" *Kwik-Kopy Corp. v. Byers*, 37 F. App'x 90, 2002 WL 1021889, at *3 (5th Cir. 2002) (unpub.) (citations omitted). But if the Court holds an "evidentiary hearing" on the issue of personal

- 11 -

jurisdiction, the plaintiff's burden is higher—"the plaintiff[] must establish personal jurisdiction by a preponderance of the evidence." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521, 529 (5th Cir. 2014) (citations omitted).

Whether a hearing is an "evidentiary hearing" for purposes of imposing the preponderance standard, rather than the *prima facie* burden, is largely fact-dependent. In *Bonner*, the Fifth Circuit held that the district court correctly applied the preponderance-of-the-evidence standard when, before any discovery, the district court: held a hearing; "invited the parties to present evidence supporting their positions"; and "considered, *inter alia*, sworn affidavits, . . . testimony, emails, and other documents introduced as exhibits." *Bonner v. Triple-S Mgmt. Corp.*, 661 F. App'x 820, 822 (5th Cir. 2016) (per curiam). The Fifth Circuit rejected the plaintiff's argument that the district court did not hold an evidentiary hearing "because the parties had yet to engage in discovery." *See id.* The Fifth Circuit reasoned that because the plaintiff "failed to raise a jurisdiction question of fact," "discovery was unnecessary[.]" *Id.*

But in *Walk Haydel*, the Fifth Circuit held that the district court improperly required more than a *prima facie* case of personal jurisdiction where it "substantially curtail[ed] the amount of discovery that could be obtained" and did not permit live-witness testimony at its evidentiary hearing. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 242 (5th Cir. 2008). Likewise, the Fifth Circuit held that the *prima facie* burden—not the preponderance standard—applied in *Kwik-Kopy*, where the district court "limit[ed] the amount of discovery that could be achieved before the hearing and refus[ed] to accept testimony of witnesses at the hearing[.]" *Kwik-Kopy*, 2002 WL 1021889, at *4.

Here, the Court's hearing was more akin to that in *Bonner*, so the preponderance standard

governs. Like the district court in *Bonner*, the Court permitted the parties to introduce evidence at the hearing and considered the evidence on the record to resolve personal jurisdiction. Further, unlike the courts in *Walk Haydel* and *Kwik-Kopy*, the Court permitted live-witness testimony; indeed, Plaintiff called its Manager to testify. Finally, though the Court denied Plaintiff jurisdictional discovery before the hearing, it did so because Plaintiff failed to identify any issues of fact relevant to determining personal jurisdiction. *See* Doc. 33, Order, 4–5. Accordingly, as in *Bonner*, "discovery was unnecessary[.]" 661 F. App'x at 822.

In sum, at the hearing, Plaintiff had the burden of showing personal jurisdiction by a preponderance of the evidence. Nevertheless, the Court explains below why Plaintiff failed to meet even a *prima facie* burden.

B.   *Even if the Court Were to Hold Plaintiff to a Prima Facie Burden, Plaintiff Did Not Meet its Burden of Establishing Personal Jurisdiction over the Entity Defendants.*[5]

Before turning to its analysis, the Court first summarizes the parties' arguments regarding personal jurisdiction. The Court then provides an overview of the relevant legal framework. Next, the Court examines Plaintiff's allegations of relevant contacts by HospisRX, followed by its allegations of relevant contacts by Crevice and HealthView. As detailed below, Plaintiff has not established a *prima facie* case of personal jurisdiction over any of the Entity Defendants.

The Entity Defendants claim they are not subject to specific personal jurisdiction in Texas because they have not "directed any business activities towards Plaintiff that relate to any of the allegations asserted in this lawsuit." Doc. 16, Defs.' Br., 12. They assert that "[t]he only specific

---

[5] Plaintiff does not contend that any of the Entity Defendants are subject to general personal jurisdiction, so the Court's analysis is limited to specific personal jurisdiction. *See* Doc. 29, Pl.'s Resp., 7 n.3.

contact with Texas" by the Entity Defendants alleged by Plaintiff is Crevice's entry of the MNDA with Plaintiff, a Texas business. *Id.* at 12–13. Even this contact, the Entity Defendants contend, is insufficient to confer personal jurisdiction over Crevice because the MDNA contained a Delaware forum-selection clause, "only involved Plaintiff sending Crevice certain information," and was negotiated by Crevice from New Jersey. *Id.* at 13–14 (citation omitted). Further, though Greene (Managing Member of Crevice) inadvertently sent the Email to Plaintiff in Texas, the Entity Defendants argue that "none of the intended recipients of that email resided in or were located in Texas when that email was sent by him or received by them." *Id.* at 14. Accordingly, the Entity Defendants maintain that the Court lacks specific personal jurisdiction over them due to their lack of activity directed at Texas. *Id.*

In response, Plaintiff argues that its allegations of the Entity Defendants' tortious interference support a finding of specific personal jurisdiction. Doc. 29, Pl.'s Resp., 9. Specifically, it contends that "the Entity Defendants solicited . . . Opalich and Radcliff . . . to pursue the formation of a new competing business with the Entity Defendants while [Radcliff] was still employed by [Plaintiff] and [Opalich] was still bound by restrictive covenants and confidentiality obligations." *Id.* (citing Doc. 5, Am. Compl., ¶¶ 46–48). Additionally, Plaintiff claims "the Entity Defendants solicited [Plaintiff's] client, Ascend, 'to cease business with [Plaintiff] and enter into a contractual arrangement for services from the new company.'" *Id.* (quoting Doc. 5, Am. Compl., ¶ 48). Plaintiff further points out that the Radcliff and Opalich Agreements, as well as the Ascend Agreement, are governed by Texas law and "were to be performed, at least in part, in the State of Texas." *Id.* at 10; *see* Doc. 17-1, Pl.'s App., 11 (stating that the Opalich Agreement is governed by Texas law); *id.* at 38 (stating that the

Radcliff Agreement is governed by Texas law).[6] Finally, Plaintiff alleges that the Entity Defendants "had knowledge of [Plaintiff's] contracts[.]" Doc. 5, Am. Compl., ¶ 81. Based on these allegations, Plaintiff argues the Entity Defendants are subject to specific personal jurisdiction in Texas. Doc. 29, Pl.'s Resp., 10.

Under *Calder v. Jones*, 465 U.S. 783 (1984), "the effects of an alleged intentional tort are to be assessed as part of the analysis of the defendant's relevant contacts with the forum." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 400 (5th Cir. 2009) (emphasis omitted) (quotation marks and citation omitted). The fact that a plaintiff resides in a state and felt the effects of the defendant's conduct there does not, on its own, support specific personal jurisdiction in that state. *Id.* at 401 (citation omitted). But "an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999) (citing *Calder*, 465 U.S. at 789–90).

Nevertheless, "[t]he 'effects' test in *Calder* does not supplant the need to demonstrate minimum contacts that constitute purposeful availment[.]" *Mullins*, 564 F.3d at 400 (citation omitted). Thus, "[t]he proper question is not whether [the plaintiff] experienced an injury or effect in a particular location, but whether [the defendant's] conduct connects it to the forum in a meaningful way." *Sangha*, 882 F.3d at 103–04 (citation omitted).

When applying *Calder*'s "effects" test to tortious-interference-with-contract claims, the Court

---

[6] At the hearing, Plaintiff also presented evidence that the Ascend Agreement is governed by Texas law.

"determine[s] whether the alleged tortfeasor expressly aimed his out-of-state conduct at the forum state by examining the nexus between the forum and the injured contractual relationship." *Mullins*, 564 F.3d at 402.

In *Central Freight Lines*, for example, the Fifth Circuit found personal jurisdiction in Texas over a defendant–shipper that had allegedly interfered with the plaintiff–shipper's contract with a third party, Dell, to deliver Dell's computers. *See* 322 F.3d at 379. In so holding, the court highlighted that the plaintiff alleged that the defendant knew about the plaintiff's relationship with Dell, a Texas entity, and that the defendant "intentionally attempted to interfere with that relationship by holding Dell freight hostage . . . and manipulating the price of freight delivery in the northeast." *Id.* at 384. Because Texas was both the plaintiff's "home state" and "the primary location of [the plaintiff's] business relationship with Dell," it was not a "mere fortuity" that the plaintiff suffered injury in Texas. *Id.*

In contrast, in *Panda Brandywine*, the Fifth Circuit found that the plaintiffs' allegations were insufficient to establish a *prima facie* case of specific personal jurisdiction. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001). In *Panda Brandywine*, the plaintiffs alleged that the defendant "decided to divest" its contract with a third party, and this divestment "caused the 'potential' for [the plaintiffs] to be in default under" financing agreements the plaintiffs entered with the third party. *Id.* at 867. After noting that many of the plaintiffs' allegations were conclusory, the Fifth Circuit reasoned that even if they were not, these allegations were "insufficient to establish a prima facie case for jurisdiction over" the defendant, because the "allegations, even if true, only relate to the foreseeability of causing injury in Texas[.]" *Id.* (citations omitted). The court emphasized that the agreements the defendant allegedly interfered with were "not governed by Texas

- 16 -

law," were "not to be performed in Texas, and have no relation to Texas other than the fortuity that [the plaintiffs] reside there." *Id.* (citation omitted).

With this legal backdrop in place, the Court turns to Plaintiff's alleged contacts by each Entity Defendant and explains why—as the Court held at the hearing—these contacts are insufficient to confer specific personal jurisdiction.

### 1. HospisRX

Plaintiff failed to establish a *prima facie* case of personal jurisdiction over HospisRX. Plaintiff alleges that HospisRX interfered with Plaintiff's agreements by soliciting Opalich, Radcliff, and Ascend. *See* Doc. 5, Am. Compl., ¶¶ 79–82; Doc. 29, Pl.'s Resp., 9. In support, Plaintiff relies upon communications between Opalich, Radcliff, Ascend, Greene, and Roberson (HealthView's President) from February 2021. *See, e.g.*, Doc. 21, Defs.' App., 31. But Plaintiff also alleges that Crevice and HealthView formed HospisRX on March 12, 2021—after any alleged solicitation of Opalich, Radcliff, or Ascend. *See, e.g.*, Doc. 5, Am. Compl., ¶¶ 47–51 (alleging that the Email was sent before HospisRX was formed). Because HospisRX was not yet formed when the relevant contacts occurred, HospisRX lacks minimum contacts with Texas giving rise to specific personal jurisdiction.[7]

### 2. Crevice and HealthView

Nor did Plaintiff show a *prima facie* case of personal jurisdiction over Crevice or HealthView.

---

[7] Further, to the extent that Plaintiff argues that HospisRX has formed additional contacts with Texas after Plaintiff filed suit, these contacts are irrelevant, as the Court considers only those contacts leading up to the filing of the complaint. *See Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 787 n.1 (5th Cir. 1990); *De Leon v. Shih Wei Nav. Co.*, 269 F. App'x 487, 490 n.11 (5th Cir. 2008) (per curiam); *Glazier Grp., Inc. v. Mandalay Corp.*, 2007 WL 2021762, at *8 (S.D. Tex. July 11, 2007) ("Courts in the Fifth Circuit . . . look[] to facts up to the filing of the complaint rather than postcomplaint conduct." (citations omitted)).

The Court evaluates the three sets of relevant contacts by Crevice and HealthView below.

First, Plaintiff contends Crevice and HealthView solicited Ascend to breach the Ascend Agreement. Doc. 29, Pl.'s Resp., 9.[8] In support, Plaintiff points out that the plan detailed in the Email, which is attached to the complaint, mentions a "[c]ontractual arrangement with" Ascend "for pharmacy network, claims adjudication and coupon aggregation at [$1.00] per claim." Doc. 5-1, Ex. to Am. Compl., 3. Plaintiff alleges these "are some of the same services [Plaintiff] had long provided for" Ascend under the Ascend Agreement, which is governed by Texas law. Doc. 5, Am. Compl., ¶ 48. But the Entity Defendants provided a declaration from Ascend's CEO, which states that the Entity Defendants have not approached him "to cease doing any business with [Plaintiff] for any purpose." Doc. 21, Defs.' App., 76. Additionally, at the hearing, Plaintiff conceded that Ascend continues to conduct business with Plaintiff. Thus, the Court does not credit Plaintiff's allegation that Crevice and HealthView solicited Ascend—rather, it considers only the allegations that Crevice and HealthView discussed business plans implicating Ascend. *See, e.g.*, Doc. 21, Defs.' App., 31.

Second, Plaintiff alleges Crevice and HealthView solicited Radcliff to breach the Radcliff Agreement. *See* Doc. 29, Pl.'s Resp., 9 (citing Doc. 5, Am. Compl., ¶¶ 46–48). But the Entity Defendants have produced uncontroverted evidence that it was Opalich—not Crevice or HealthView—that reached out to Radcliff about the formation of HospisRX. *See* Doc. 21, Defs.' App., 31. Because the Entity Defendants have thus controverted Plaintiff's allegation that Crevice and HealthView solicited Radcliff, the Court will disregard this allegation.

Third, Plaintiff alleges that Crevice and HealthView solicited Opalich to breach the Opalich

---

[8] Notably, Plaintiff does not directly allege this in its operative complaint. *See generally* Doc. 5, Am. Compl.

Agreement, which is governed by Texas law and required performance, at least in part, in Texas. Doc. 29, Pl.'s Resp., 9–10 (citing Doc. 5, Am. Compl., ¶¶ 46–48); *see* Doc. 17-1, Pl.'s App., 11. But Plaintiff has not alleged any facts suggesting Crevice or HealthView solicited Opalich. *See generally* Doc. 5, Am. Compl. Indeed, Plaintiff has not even alleged Crevice or HealthView solicited or otherwise reached out to Opalich to form HospisRX. *See generally id.* Rather, most of the complaint alleges facts suggesting that Opalich was the party reaching out to others to form HospisRX. *See, e.g., id.* ¶ 46 (alleging Opalich solicited "one of [Plaintiff's] clients" and "contacted an investment company . . . to solicit investments for the new hospice [PBM] company"). Accordingly, to the extent Plaintiff now argues Crevice and HealthView solicited Opalich to breach the Opalich Agreement, this is a conclusory allegation that the Court need not credit. *See Panda Brandywine*, 253 F.3d at 867.[9]

After discounting Plaintiff's controverted and conclusory allegations, little is left—and what remains is insufficient to establish purposeful conduct by Crevice or HealthView directed toward Texas. Namely, Plaintiff alleges Crevice and HealthView participated in email and telephone discussions with Opalich, Radcliff, and Ascend's CEO about forming HospisRX. *See, e.g.*, Doc. 5, Am. Compl., ¶¶ 47–48. These discussions, however, do not "constitute purposeful availment, that is, conduct . . . that invoked the benefits and protections of [Texas] or was otherwise purposefully directed toward" Plaintiff, a Texas resident. *See Mullins*, 564 F.3d at 400. More specifically, unlike

---

[9] At the hearing, Plaintiff also relied upon Crevice's communications with Opalich and the resulting entry of the MNDA with Plaintiff. But these communications and agreement did not give rise to Plaintiff's claim for tortious interference with contract against Crevice, which, according to Plaintiff, is based on the allegations that "the Entity Defendants solicited . . . Opalich and Radcliff . . . to pursue the formation of a new competing business" and "solicited . . . Ascend" to abandon its business with Plaintiff. Doc. 29, Pl.'s Resp., 9; *see Gundle*, 85 F.3d at 205.

the plaintiff–shipper in *Central Freight*, Plaintiff here fails to allege facts suggesting any intentional interference with a Texas-based contractual relationship. *See* 322 F.3d at 385 (citations omitted).

The facts that the Opalich and Ascend Agreements are governed by Texas law, and that the Opalich Agreement contemplated partial performance in Texas, does not change this conclusion. Although a choice-of-law clause is relevant to the minimum-contacts analysis, "the presence of a choice-of-law clause is not sufficient in itself to establish personal jurisdiction when, as here, the contacts do not otherwise demonstrate that the defendant purposefully availed himself of the privilege of conducting business in Texas." *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 223 (5th Cir. 2012) (citation and quotation marks omitted).[10] Further, though the Opalich Agreement concerned partial performance in Texas, Plaintiff does not argue that any remaining obligations under the Opalich Agreement were to be performed in Texas. Indeed, Opalich's post-termination covenants—whether or not they are still in effect—would apply to him regardless of where he lived and worked. *See* Doc. 17-1, Defs.' App., 2–13. At bottom, even if the Opalich and Ascend Agreements, which were allegedly affected by Crevice and HealthView's discussions, contain Texas choice-of-law clauses and entertain some degree of performance in Texas, Plaintiff still has not shown conduct by Crevice or HealthView that "connects [them] to [Texas] in a meaningful way." *Sangha*, 882 F.3d at 103–04.

Accordingly, Plaintiff did not satisfy its *prima facie* burden of establishing minimum contacts

---

[10] The Fifth Circuit made this statement in the context of analyzing whether a defendant was subject to specific personal jurisdiction based on its entry of a contract with the plaintiff—not based on its interference with a contract. *See id.* at 222. Nevertheless, the rationale is likewise applicable in assessing personal jurisdiction based on tortious interference, as this assessment requires the Court to examine "the nexus between the forum and the injured contractual relationship." *Mullins*, 564 F.3d at 402 (citations omitted).

by Crevice and HealthView. And for all of the reasons articulated above, it necessarily failed to meet the higher preponderance-of-the-evidence standard. The Court therefore **GRANTED** the Entity Defendants' motion to dismiss for lack of personal jurisdiction and hereby **DISMISSES** the tortious-interference claim against the Entity Defendants **WITHOUT PREJUDICE**.

C.   *Plaintiff Did Not Show that Jurisdictional Discovery Was Warranted.*

Finally, the Court denied Plaintiff's request for jurisdictional discovery at the hearing. As previously held, the motion-to-dismiss briefing did not present any issues of fact warranting jurisdictional discovery. *See* Doc. 33, Order, 4–5. Nor did the argument or evidence presented at the hearing raise new issues of fact. Because Plaintiff did not identify fact issues warranting jurisdictional discovery or make a preliminary showing of personal jurisdiction, the Court **DENIED** jurisdictional discovery as unnecessary. *See, e.g., Sedillo v. Team Techs., Inc.*, 2020 WL 5411697, at *1 (N.D. Tex. Sept. 9, 2020) (citations omitted).

## IV.

## CONCLUSION

For the reasons stated above, as well as those provided at the July 16, 2021, hearing, the Court **GRANTED** the motion to dismiss (Doc. 15) insofar as it sought dismissal of the claim against the Entity Defendants for lack of personal jurisdiction. The Court thus **DISMISSES** the tortious-interference claim against the Entity Defendants **WITHOUT PREJUDICE** and directs the Clerk to terminate Crevice, HealthView, and HospisRX as parties in this case.

SO ORDERED.

SIGNED: July 27, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE