UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EHO360, LLC, | § | |
| | § | |
| Plaintiff/Counterdefendant, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-0724-B |
| | § | |
| NICHOLAS OPALICH and TAMMY | § | |
| RADCLIFF, | § | |
| | § | |
| Defendants/Counterclaimants. | § | |

MEMORANDUM OPINION AND ORDER

Before the Court are Counterdefendant EHO360, LLC ("EHO")'s Motion to Dismiss
Nicholas Opalich ("Opalich")'s Amended Counterclaim for Fraudulent Inducement (Doc. 51) and
Motion to Dismiss Defendant Tammy Radcliff ("Radcliff")'s Counterclaim (Doc. 47). For the reasons
stated below, the Court **GRANTS** both motions.

I.

BACKGROUND

This is a dispute between a company and two of its former executives. EHO is a "prescription
claims processor and pharmacy benefit manager" ("PBM"). Doc. 42, 2d Am. Compl., ¶ 8. In
February 2019, EHO hired Opalich as its Chief Executive Officer ("CEO"). *Id.* ¶ 15. Opalich signed
an employment agreement (the "Opalich Agreement") that contained, among other provisions,
noncompete and confidentiality restrictions. *See id.* ¶¶ 16–21. In July 2020, "EHO hired Radcliff . . .
as its Executive Vice President of Hospice PBM Division" ("EVP Hospice"). *Id.* ¶ 24. Radcliff also
signed an employment agreement (the "Radcliff Agreement") that contained, among other
provisions, noncompete and confidentiality restrictions. *See id.* ¶¶ 25–29. EHO terminated Opalich's

- 1 -

employment in September 2020. *Id.* ¶ 46. Radcliff notified EHO of her resignation in March 2021. *Id.* ¶ 58.

EHO filed this suit within a month of Radcliff's resignation, claiming that Opalich and Radcliff are operating a new business venture that directly competes with EHO, thus breaching their employment agreements and fiduciary duties, and that Opalich fraudulently induced EHO to grant him a severance payment. Doc. 1, Compl.; Doc. 42, 2d Am. Compl., ¶¶ 64–88.[1] Opalich and Radcliff each answered EHO's complaint and asserted counterclaims. Doc. 43, Radcliff Answer & Countercl.; Doc. 46, Opalich Answer & Am. Countercl. EHO moves to dismiss in part Opalich's Counterclaims, Doc. 51, Mot. Dismiss Opalich, and to dismiss Radcliff's Counterclaim, Doc. 47, Mot. Dismiss Radcliff. The Court outlines the counterclaims relevant to this motion below.

A.    *Opalich's Fraudulent-Inducement Counterclaim*

EHO moves to dismiss Opalich's fraudulent-inducement counterclaim.[2] Doc. 51, Mot. Dismiss Opalich.

Opalich claims that he was fraudulently induced to accept employment as EHO's CEO. Doc. 46, Opalich Answer & Am. Countercl., ¶¶ 19–24. Specifically, Opalich pleads that "in January 2019" he "interviewed [for the CEO position] with EHO's Board, which was comprised of partners [Bryan] Springston [('Springston')], Larry Luedke [('Luedke'),] and Tom Lanham [('Lanham') (collectively, 'the Board')]." *Id.* ¶ 6.

During the interview, the Board "stated they were looking for a CEO to grow and sell the

---

[1] EHO's claims against various other entities were dismissed for lack of personal jurisdiction. *See EHO360, LLC v. Opalich*, 2021 WL 3174502, at *10 (N.D. Tex. July 27, 2021).

[2] Opalich also asserts a Fair Credit Reporting Act counterclaim, which EHO does not move to dismiss. Doc. 51, Mot. Dismiss Opalich, 2 n.1.

business." *Id.* Opalich claims the Board expressed that, having tried and failed to sell EHO three times, "they were truly interested in selling." *Id.* In response, Opalich says he "discussed fourteen critical items that were necessary in order to sell the company," including (1) "the importance of EHO owning its software"—which "Tom Lanham emphatically informed him that EHO owned"; (2) the need to consolidate EHO's "six separate interlocking companies"; (3) "that [EHO had] no employment agreements with key people"; and (4) "the importance of having a financial audit, SOC I and SOC II audits, and resolving any tax related issues." *Id.* ¶ 7. "Opalich was informed by the Board that he had their support in affecting the changes necessary to make the company saleable" and "Lanham specifically assured Opalich 'we have your back.'" *Id.* Opalich was also "led to believe that EHO's business practice was . . . 'pass-through pricing' . . . [and] that EHO never used any 'spread pricing,'" a practice that involves "charg[ing] the plan sponsor more than they pay the pharmacy for a medication and keep[ing] the spread as profit" and that Opalich claims "result[s] in clients being overbilled and pharmacies underpaid." *Id.* ¶¶ 16–17.

After the Board interview, EHO offered Opalich the CEO position and he "entered into the [Opalich] Agreement." *Id.* ¶ 9. As part of this agreement, "EHO promised to pay [Opalich] a minimum of $1,000,000 in the event that a purchaser was found for [EHO]." *Id.*

Opalich's tenure at EHO proved full of disappointments. He "learned that EHO did not own [its] middleware software" but that the software was owned by a company owned by one of EHO's key employees, who did not have an employment agreement with EHO and who was earning commissions and consulting fees from an EHO white label client. *Id.* ¶¶ 11–12. Opalich approached this employee and two other key employees with employment agreements, but each of them declined to sign. *Id.* ¶¶ 12–15. One of these three employees was the son of Board member Lanham and

Opalich claims Lanham advised his son not to sign the agreement—advice the son passed on to the other two. *Id.* ¶¶ 14–15. Opalich claims he "reminded the Board that [securing employment agreements with key employees] was one of the issues that needed to be resolved to successfully sell EHO[,]" but the Board "chose not to . . . back Opalich up as they had promised." *Id.* ¶ 15. Opalich also learned that "EHO was using spread pricing," "was not licensed as a PBM in any state," "had no effective licenses plan underway, [and] no financial audits underway," and that EHO had "tax issues." *Id.* ¶¶ 16–18.

Opalich claims that, at the time of his hiring, the Board was aware of and did not intend to change any of the above "risk factors," such that the Board's statements to the contrary during his interview fraudulently induced him to accept employment and enter the Opalich Agreement. *Id.* ¶¶ 20–22. He asserts that "[i]f EHO had not offered him the $1,000,000 sale bonus, and [EHO's Board members] had not made the representations regarding its software and [their] desire to sell the company," or "had he known EHO used spread pricing," he "would not have taken the CEO position" and entered the Employment Agreement. *Id.* ¶¶ 10, 17.

B.     *Radcliff's Counterclaim*

EHO also moves to dismiss Radcliff's counterclaim. Doc. 47, Mot. Dismiss Radcliff.

Radcliff claims that she was fraudulently induced to accept the EHO EVP Hospice position. Doc. 43, Radcliff Answer & Countercl., ¶¶ 17–23. Specifically, she claims that after she met EHO officials in March 2020 (while she was working as a consultant for KemPharm®, in which she had an ownership stake), EHO began "courting" her by telling her "they wanted to bring [her in as] a subject matter expert . . . to turn [EHO's] hospice business around," and that EHO "would provide support for her to grow [EHO's] hospice business" and "support her in her efforts to turn the hospice

area around." *Id.* ¶¶ 6, 8–9. She alleges that she told the Board she had no desire to "grow[] the bottom line" of a company that was to be sold, and that during an Austin, Texas, interview with Springston, Ludke, and Lanham, she "informed the Board that she was not going to be another 'house flipper'" and the Board assured her she would not be. *Id.* ¶¶ 11, 18. "At no point prior to presenting Radcliff with an employment agreement did EHO inform her that it intended to sell the business," she says. *Id.* ¶ 11. In July 2020, "rel[ying] on the representations of EHO concerning its desire to develop and grow the Hospice Division[] and that it did not intend to sell the company," Radcliff accepted the EVP Hospice position and executed the Radcliff Agreement. *Id.* ¶ 12.

Radcliff states that the next month she learned that EHO was actively trying to sell the company. *Id.* ¶ 13. In an early-August phone call with another EHO executive, Dina McKenna ("McKenna"), McKenna "told Radcliff that the company was for sale." *Id.* She also "learned from McKenna that EHO was not a licensed PBM" and "was not HIPAA compliant." *Id.* ¶ 14. Radcliff also claims that EHO did not support her marketing efforts or finish an "e-prescribed technology platform" she needed to grow the hospice business, "[d]espite [the Board's] assurances" that they would support her. *Id.* ¶¶ 15–16.

Radcliff claims that if she had known that the company was for sale she would not have accepted employment and entered the Radcliff Agreement. *Id.* ¶ 13. She states that by failing to disclose that EHO was actively looking to sell the company, that Opalich had a significant financial incentive to achieve a sale, and that EHO lacked licenses to operate as a PBM, and by hampering her marketing efforts and "fail[ing] to provide technical infrastructure, budgeting[,] and personnel" after they had promised support, the Board fraudulently induced her to sign the Radcliff Agreement. *Id.* ¶¶ 17–21. On March 4, 2021, Radcliff notified EHO of her resignation. Doc. 42, 2d Am. Compl.,

¶ 58; Doc. 43, Radcliff Answer & Countercl., ¶ 58 (admitting the allegations in this paragraph of the Second Amended Complaint).

EHO's motions to dismiss have been fully briefed and are ripe for determination. The Court considers them below.

## II.

## LEGAL STANDARDS

A.     *Rule 9(b)*

A dismissal for failure to plead with particularity in accordance with Rule 9(b) is treated as a Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). Rule 9(b) provides, in pertinent part, that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The amount of particularity required for pleading fraud differs from case to case. *See Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003); *see also Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997) (noting that "courts have emphasized that Rule 9(b)'s ultimate meaning is context-specific"). A traditional fraud claim requires pleading with particularity the "'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 892 (5th Cir. 2013) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

B.     *Fraudulent Inducement*

"Texas law[3] . . . impose[s] a duty to abstain from inducing another to enter into a contract

---

[3] The parties agree that Texas law governs the Opalich and Radcliff agreements. *See Opalich*, 2021 WL 3174502, at *7, *9.

through the use of fraudulent misrepresentations." *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018). Fraudulent inducement requires a claimant to prove:

> (1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury. Fraudulent inducement is actionable when the misrepresentation is a false promise of future performance made with a present intent not to perform.[4]

*Id.* (first citing *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015); then citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)). "A false representation is material if a reasonable person would attach importance to and be induced to act on the information." *Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1033 (5th Cir. 2010). The material-misrepresentation element of a Texas-law fraud claim "can be met if the defendant concealed or failed to disclose a material fact when a duty to disclose existed." *United Tchr. Assocs. Ins. Co. v. Union Lab. Life Ins. Co.*, 414 F.3d 558, 566 (5th Cir. 2005). "In general, there is no duty to disclose without evidence of a confidential or fiduciary relationship. But there may be a duty to disclose when the defendant made a partial disclosure that created a false impression." *CBE Grp., Inc. v. Lexington L. Firm*, 993 F.3d 346, 353 (5th Cir. 2021) (alterations incorporated) (cleaned up) (quoting *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219–20 (Tex. 2019)).

## III.

## ANALYSIS

Below, the Court first considers Opalich's fraudulent-inducement counterclaim and finds that

---

[4] The plaintiff must also show the existence of a contract. *Id.* Here, the parties do not dispute that Opalich and Radcliff entered contracts. *See* Doc. 43, Radcliff Answer & Countercl.; Doc. 46, Opalich Am. Answer & Countercl.

Opalich has not sufficiently alleged fraudulent intent for any material misrepresentation made by EHO or that a material misrepresentation caused him to be unable to secure the promised $1,000,000 sale bonus. Next, the Court turns to Radcliff's counterclaim, which it also finds insufficiently pled. Accordingly, the Court dismisses each of these counterclaims without prejudice.

A.    *Opalich's Fraudulent-Inducement Counterclaim*

Opalich claims that he was fraudulently induced to take the EHO CEO position by the following false statements or omissions:

> "[T]hat the Board had his back and would support him in his efforts to sell the company and fix the risk factors that he had identified during his interview." [("The 'We've Got Your Back' Statement")]

> "[The Board] failed to disclose . . . that EHO did not own the middleware software for the company" after Lanham "emphatically informed [Opalich] that EHO owned its software." [("The 'EHO Owns Its Software' Statement")]

> "EHO failed to inform Opalich that the company was not licensed in any state." [("The 'Lack of State PBM Licensure' Omission")]

> "EHO failed to inform Opalich that they [sic] had no intention of having key employees enter into employment agreements." [("The 'No Intention of Having Key Employees Enter Into Employment Agreements' Omission")]

> "EHO failed to inform Opalich that they [sic] had no intention of changing the way that business was being done because it might affect their [sic] individual cash flow." [("The 'No Intention of Changing The Way That Business Was Done' Omission")]

> "EHO [promised] Opalich . . . at least a $1,000,000 payment in the event of an acquisition of the company," but "this promise was illusory as they [sic] had no intention of backing him up in his efforts to make the company saleable." [("The '$1,000,000 Incentive Payment' Statement")]

Doc. 46, Opalich Answer & Am. Counterclaim, ¶¶ 7, 20–21.

EHO argues that none of these statements or omissions can support a claim for fraudulent inducement under Texas law. Doc. 51, Mot. Dismiss Opalich, 5. First, it argues that the statement

that "the Board had [Opalich's] back and would support him in his efforts to sell the company and fix the [identified] risk factors" is a "vague and ambiguous statement about future events" that "simply cannot support a fraud claim as a matter of law." *Id.* at 4–5. Second, EHO claims that Opalich does not claim that EHO's statement that it owned its own software was false or explain why such a claim was material to his decision to accept the CEO position. *Id.* at 5. Third, EHO states that "Opalich . . . fails to explain how he was led" by the Board to believe that the company used pass-through pricing and never used spread pricing, so this claim does not meet the Rule 9(b) pleading standard. *Id.* at 5–6. Fourth, EHO claims that even if any of these statements was a material misrepresentation, Opalich has not pled facts tying the misrepresentation to a pecuniary loss because he has not shown that his reliance on any misrepresentation "caused him to lose [the $1,000,000] incentive payment." *Id.* at 6.

Opalich responds by additionally identifying that "Springston, . . . Luedke[,] and . . . Lanham[] were aware [at the 2019 interview] that the company had . . . risk factors" they did not intend to change, including "(1) . . . tax issues; (2). . . no financial audits underway; (3) . . . having key employees [without] employment agreements; [and] (4) . . . not [being] licensed in any state as a PBM[,]" all of "which made EHO difficult to sell at an attractive 45-million-dollar price" and accordingly made it "unrealistic" that Opalich would realize the $1,000,000 incentive. Doc. 53, Opalich Resp., 4–5.

The Court considers each of Opalich's arguments in turn and finds them unavailing.

<u>        1.        The "We've Got Your Back" Statement</u>

First, the Court finds that the Board's statement during the 2019 interview "that [they] had his back and would support him in his efforts to sell the company and fix the risk factors that he had

- 9 -

identified during his interview," Doc. 46, Opalich Answer & Am. Countercl., ¶ 20, is not a material misrepresentation because a reasonable person in Opalich's position would not "attach importance to and be induced to act on" this statement. *See Shandong*, 607 F.3d at 1033. This is an "inherently vague and ambiguous" statement unsupported by pleadings that the Board "presented [Opalich] any detailed, corroborating information, facts or figures to support the statement that might entice a reasonable person to attach importance to the statement." *See id.*

Further, Opalich has not "sufficiently . . . allege[d] that the ["We've Got Your Back" Statement] was false when made" or asserted without regard to its truth. *See id.* "Generally, 'there is no inference of fraudulent intent not to perform from the mere fact that a promise made is subsequently not performed.'" *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 386 (5th Cir. 2003) (quoting *United States v. Shah*, 44 F.3d 285, 293 (5th Cir.1995)). "Therefore, the requisite intent must be coupled with prompt, substantial nonperformance to demonstrate fraud in the inducement." *Id.*; *see Waller v. DB3 Holdings, Inc.*, 2008 WL 373155, at *7 (N.D. Tex. Feb. 12, 2008) ("Failure to perform a promise, standing alone, is no evidence of the promissor's intent not to perform when the promise was made. However, that fact is a circumstance to be considered with other facts to establish intent.") (alteration incorporated) (quoting *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986))).

Here, the only specifically pled act from which the Court might infer fraudulent intent regarding the "We've Got Your Back" Statement is Lanham's later advice that his son not sign the proffered employment agreement. *See* Doc. 46, Opalich Answer & Am. Countercl., ¶¶ 14–15. But according to Opalich, the Board made the "We've Got Your Back" Statement in January 2019. *Id.* ¶ 6. Opalich presented the employment agreements to the key employees, including Lanham's son,

months later, in July 2019. *Id.* ¶¶ 13–14. Given the six-month gap between the statement and Lanham's advice to his son regarding the employment agreement, and the fact that the employment agreements had not been developed when the statement was made, Lanham's later advice does not give rise to an inference that the Board never intended to "have Opalich's back." *See id.* (indicating that the employment agreements were prepared by McKenna and presented in July 2019); *cf. Shandong*, 607 F.3d at 1034 (citing *Shah*, 44 F.3d at 293 n.14 for the premise that a "short interval between alleged promise and failure to perform may be probative of fraud").

For these reasons, Opalich has not sufficiently pled that the "We've Got Your Back" Statement was a material misrepresentation or that it was made with fraudulent intent.

### 2.    The "EHO Owns Its Software" Statement

The Court now turns to the alleged software-ownership misrepresentation. Opalich pleads that "Tom Lanham emphatically informed him that EHO owned its software", *id.* ¶ 7, and that "[the Board] failed to disclose . . . that EHO did not own the middleware software for the company," which Opalich claims he communicated "was critical for any prospective purchaser." *Id.* Taking Opalich's pleadings as true, the Court finds that Lanham's statement that "EHO owned its software" is a plausible and adequately pled material misrepresentation. Even if Lanham's comment did not specifically refer to the critical middleware software but only to EHO's "software" generally, his partial disclosure regarding software ownership could have triggered a duty to disclose that the middleware software, specifically, was not owned by EHO. *See* Doc. 46, Opalich Answer & Am. Countercl., ¶¶ 7, 11–12; *CBE Grp.*, 993 F.3d at 353 ("[T]here may be a duty to disclose when the defendant made a partial disclosure that created a false impression.").

However, Opalich has not alleged that when Lanham made this statement Lanham—or the

rest of the Board—was aware that it was false, has not pleaded facts to circumstantially support such knowledge, and has not alleged that Lanham's statement was made without regard for its truth. *See* Doc. 46, Opalich Answer & Am. Countercl., ¶ 11; *Shandong*, 607 F.3d at 1034.

Opalich pleads that "[d]uring [his] employment . . . [he] learned that EHO did not own the middleware software as had been represented to him by Lanham." Doc. 46, Opalich Answer & Am. Countercl., ¶ 11. He further pleads that he learned the middleware software "was owned by a company called Bit Relations, Inc. . . . [which] was owned by . . . Lowery, one of the key software technicians employed by EHO." *Id.* Opalich also states that he learned that Lowery was earning substantial revenue from his relationship with a white label client of EHO for whom he had built a website, and that "the Board knew that Lowery was involved in a separate consulting relationship [for an EHO white-label client] which paid an undisclosed amount of income" and that Lowery had "built a website for [that client] known as 'Blue Diamond.'" *Id.* ¶ 12. Finally, Opalich pleads that the Board "later" asked him "to lead the purchase of the software from Lowery." *Id.* ¶ 11.

Importantly, Opalich has not pleaded that Lanham, or any other individual Board Member knew or had reason to know by virtue of their individual position and involvement at EHO, that Bit Relations, Inc.—not EHO—owned the middleware software. *Cf. In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 870 (S.D. Tex. 2001) (applying Rule 9 in a securities fraud context) ("Plaintiffs must . . . specifically plead what [each corporate executive] learned, when he learned it, and how Plaintiffs know what he learned."). Neither has Opalich pleaded that Lanham recklessly made the assertion without knowledge. *See* Doc. 46, Opalich Answer & Am. Countercl., ¶¶ 7, 11–12. Opalich pleads that the Board knew that Lowery was a paid consultant for an EHO white-label client and that he had built a website for that client, but this does not support any inference about the Board's

knowledge of EHO's software ownership. *See id.*

Also, Opalich has not pleaded *how much later* (after he became CEO) the Board asked him to lead the effort to buy the software from Lowery. *Id.* ¶ 11; *cf. Shandong*, 607 F.3d at 1034 (citing *Shah*, 44 F.3d at 293 n.14). Lacking these sorts of details, Opalich's pleadings do not plausibly support an inference that Lanham's misrepresentation was made intentionally or recklessly, or that any other Board member was aware of the middleware software's true ownership during the interview and failed to disclose it. *See id.* (noting that corroborating details may allow the Court to draw an inference of fraudulent intent where alleged actions could be either legitimate or fraudulent); *Ashcroft v. Iqbal*, 556 U.S. 662, 686–87 (2009) (noting that the plausibility standard of Rule 8 applies to allegations of fraudulent intent). Therefore, the "EHO Owns Its Software" Statement, as currently pled, does not support a claim for fraudulent inducement.[5]

### 3.     The "Lack of State PBM Licensure" Omission

Next, Opalich identifies an allegedly fraudulent omission: that "EHO failed to inform Opalich that the company was not licensed in any state." Doc. 46, Opalich Answer & Am. Countercl., ¶ 20. Opalich does not plead that he specifically asked the Board during the interview whether EHO was licensed as a PBM in any state or that the Board made any disclosure related to licensure. *See id.* ¶ 7. As explained above, absent a misleading partial disclosure or the existence of a fiduciary or confidential relationship that gave rise to a duty to disclose—neither of which he pleads—Opalich has not shown that the "Lack of State PBM Licensure" Omission was a material omission that can

---

[5] Because the Court finds that Opalich has not sufficiently alleged the intent element of a Texas fraudulent-inducement claim for the software-ownership misrepresentation, the Court does not now consider whether Opalich has sufficiently pled that he relied on the software ownership statement, that such reliance was reasonable, or that he was damaged thereby. *See Anderson*, 550 S.W.3d at 614.

support his claim for fraudulent inducement. *See CBE Grp., Inc.*, 993 F.3d at 353.

    4.    <u>The "No Intention of Having Key Employees Enter Into Employment Agreements"</u>
          <u>and "No Intention of Changing The Way That Business Was Done" Omissions</u>

Next are Opalich's arguments based on the Board's alleged "fail[ure] to inform Opalich that they [sic] had no intention of having key employees enter into employment agreements" and "fail[ure] to inform Opalich that they [sic] had no intention of changing the way that business was being done because it might affect their [sic] individual cash flow." *Id.* ¶ 20. These omissions are insufficient for the reasons given in the Court's discussion of the "We've Got Your Back" statement, above. The Court cannot infer fraudulent intent regarding the employment agreements from the circumstances Opalich has pled. *See Willard*, 336 F.3d at 386. And the alleged failure to disclose that the Board had "no intention of changing the way business was being done" is not a material omission because its inverse—a positive assertion that the Board intended to "change the way business was being done"—would have been too vague and nonspecific for a reasonable person in Opalich's position to rely on. *Cf. Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 181 (Tex. 1997) (explaining that fraudulent non-disclosure is merely a subspecies of fraud because a "nondisclosure may be as misleading as a positive misrepresentation of facts"); *Shandong*, 607 F.3d at 1033 (finding that an overly vague and nonspecific statement on which a reasonable person would not rely is not a material misrepresentation). Therefore, these two omissions will not support Opalich's fraudulent-inducement claim.

    5.    <u>The "$1,000,000 Incentive Payment" Statement</u>

Similarly, Opalich has not adequately pled that "EHO['s promise of] at least a $1,000,000 payment in the event of an acquisition of the company . . . was illusory as they had no intention of backing him up in his efforts to make the company saleable." Doc. 46, Opalich Answer & Am.

Countercl., ¶ 21. As the Court has explained above, Opalich has not shown that the statement promising support for his efforts to sell the company was a material misrepresentation. Further, he has not sufficiently alleged that any of the Board's purported misrepresentations or omissions made the promise of a sale-based bonus illusory. Opalich claims that the misrepresentations and omissions, in total, "made EHO difficult to sell at an attractive 45-million-dollar price" and accordingly made it "unrealistic" that Opalich would realize the $1,000,000 incentive. Doc. 53, Opalich Resp., 4–5. But the $45,000,000 valuation is not included in Opalich's operative Complaint and he has not pled facts showing what basis he had for believing that $45,000,000 was an attractive price, or that the $45,000,000 price was any part of his initial discussions with the Board. *See* Doc. 46, Opalich Answer & Am. Countercl.

In sum, the Court finds no basis to conclude that the Board knew in January 2019 when it offered the $1,000,000 incentive that it intended not to support Opalich in specific efforts to achieve a sale of EHO or that the incentive promise was "illusory." *See id.* ¶ 21.

        6.      Other Risk Factors and Spread Pricing

Finally, the Court finds insufficient Opalich's other allegations that "Springston, . . . Luedke[,] and . . . Lanham[] were aware [at the 2019 interview that] the company had . . . risk factors" that the Board did not intend to change, including "tax issues . . . [and] no financial audits underway," Doc. 53, Opalich Resp., 4–5, and that he was "led to believe" EHO used pass-through rather than spread pricing, Doc. 46, Opalich Answer & Am. Countercl., ¶¶ 10, 16–17.

Opalich pleads that at the January 2019 interview with the Board "[h]e discussed the importance of having a financial audit, SOC I and SOC II audits, and resolving any tax related issues." *Id.* ¶ 7. But he does *not* plead that the Board members told him that audits were underway

or that the company had no tax issues, or that he specifically asked about and was given false or misleading information about these factors. *See id.* Instead, Opalich's pleadings that he discussed the "risk factors" of resolving tax issues and the importance of "having" pre-sale audits supports an inference that these were problem areas he intended to address as CEO, not that he relied on a representation that it would not be necessary to address them. Therefore, he has shown neither a material misrepresentation nor a duty to disclose regarding the audits or the tax issues.

Regarding spread pricing, Opalich has not pleaded the "who, what, where, when, and how" for what the Board told him regarding EHO's pricing practices. *See* Doc. 46, Opalich Answer & Am. Countercl., ¶¶ 16–17 (stating that Opalich "was led to believe" during his interview with the Board that EHO used "pass-through" and not spread pricing); *Nunnally,* 519 F. App'x. at 892. Therefore, these alleged statements or omissions are not pled with the particularity required by Rule 9(b).

In conclusion, for all these reasons, the Court **DISMISSES WITHOUT PREJUDICE** Opalich's fraudulent-inducement counterclaim.

B.    *Radcliff's Counterclaim*

Radcliff claims that she was fraudulently induced to take the EHO EVP Hospice position when "Luedke, Springston, and Lanham failed to disclose to Radcliff that EHO was actively looking for a purchaser for the company" after she told them "she was not going to be another 'house flipper'" during the Austin interview. Doc. 43, Radcliff Answer & Countercl., ¶¶ 11, 18–20. Radcliff states "she was assured that she was not going to be another 'house flipper'" and that "EHO failed to inform [her] that . . . EHO had incentivized [Opalich] with at least $1,000,000 payment in the event of an acquisition of the company." *Id.* ¶ 18. She also claims that EHO's unfulfilled promises "to provide technical infrastructure, budgeting, and personnel to support [her] efforts" and "fail[ure] to inform

Radcliff of EHO's lack of licenses to operate as a PBM" are other material statements or omissions that "induced her to continue to work with the company until it became intolerable." *Id.* ¶ 21.

EHO argues that Radcliff's counterclaim should be dismissed because: (1) Radcliff fails to allege any material misrepresentation that could form the basis of a fraudulent-inducement claim; (2) Radcliff could not reasonably rely on "alleged pre-contractual misrepresentations that directly conflict with the unambiguous language of her contract"; and (3) Radcliff fails to allege a legally cognizable injury resulting from any such reliance. Doc. 47, Mot. Dismiss Radcliff, 1–2.

As a threshold matter, the Court finds that only one of the purported statements or omissions Radcliff offers as a basis for her claim is an adequately pled material misrepresentation. *See Nunnally*, 519 F. App'x. at 892; *Shandong*, 607 F.3d at 1033. This is the Board's failure to disclose that it was actively looking to sell the company, during the Austin interview, after she informed them that she would not be a "house flipper." *See CBE Grp., Inc.*, 993 F.3d at 353.

Radcliff's other proffered statements/omissions are plainly insufficient. First, her claim that EHO fraudulently induced her to accept the position with unfulfilled promises "to provide technical infrastructure, budgeting, and personnel to support [her] efforts," *id.* ¶ 21, is insufficient under Rule 9(b) because she has not pled with particularity what technical infrastructure, budget, or personnel she was falsely promised. *Cf. Universal Plant Servs. of Beaumont, LLC v. Honeywell Int'l, Inc.*, 2019 WL 13144061, at *7 (E.D. Tex. Aug. 9, 2019) (finding that a purchaser's claim that the seller "affirmatively represented [during the bid phase] that [they] possessed the skill, expertise, facilities, and equipment required to properly perform the services requested by [the buyer]" was "too vague and imprecise to state a claim for . . . fraudulent inducement under Rule 9(b)"). This claim is also insufficient because without more detailed allegations regarding the budget, technology, and

personnel promises, the Court cannot determine whether a reasonable person in Radcliff's situation would have relied on the alleged representations. C*f. id.*

Additionally, Radcliff has not adequately pleaded that EHO owed her a duty to disclose either "EHO's lack of licenses to operate as a PBM," Doc. 43, Radcliff Answer & Countercl., ¶ 21, or that it "had incentivized [Opalich] with at least $1,000,000 payment in the event of an acquisition of the company." *Id.* ¶¶ 18–20. As the Court noted in its discussion of Opalich's claim, Radcliff provides no "evidence of a confidential or fiduciary relationship" at the time of the interview or that EHO "made a partial disclosure [regarding PBM licensure] that created a false impression," establishing a duty to disclose the PBM licensure status. *See CBE Grp.*, 993 F.3d at 353. And even if the Board's response to Radcliff's statement that she "would not be a house flipper" triggered a duty to disclose that EHO was actively seeking a sale, it is not clear why the Board would have a duty (or even the right) to disclose EHO's compensation arrangement with Opalich. *See Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 859 (5th Cir. 2004) (finding a fraud "claim based on failure to disclose . . . deficient because [the claimant] has not pleaded or argued any exception that would have given [the defendant] a duty to disclose"); *cf. Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 88 (2d Cir. 1991) (noting that employees have a strong privacy interest in their non-public compensation information).

Turning to the Board's alleged misrepresentation by omission that EHO was not seeking a sale, the Court finds that, assuming arguendo that this was a material misrepresentation, Radcliff has not plausibly pled injury resulting from her reliance on it. C.*f. Prokopeas v. Rapp Collins World Wide, Inc.*, 2004 WL 2296827, at *3–4 (N.D. Tex. Oct. 13, 2004) (finding that an employer was not entitled to summary judgment on an employee's fraudulent-inducement claim where the employee

alleged the employer made false representations about the offered position's growth potential and then *terminated the employee's employment*). Though Radcliff claims she was forced to end her employment when it became intolerable because of EHO's failure to give her the budget, technological platforms, and staffing she needed to grow the business, and because her marketing efforts were stymied, as explained above, only the alleged sale misrepresentation is an actionable basis for her fraudulent-inducement claim. *See* Doc. 43, Radcliff Answer & Countercl., ¶¶ 15–16, 21. And as EHO has noted, Radcliff remained in her position for seven months after she learned in August 2020 from McKenna that EHO was actively seeking a sale, until her voluntary resignation in March 2021. Doc. 43, Radcliff Answer & Counterclaim, ¶¶ 13, 58; Doc. 42, 2d Am. Compl., ¶ 58; Doc. 54, Pl.'s Reply, 4, 7. This suggests that the misrepresentation was not the cause of her resignation.

Further, EHO was *not* sold during her employment. *See* Doc. 42, 2d Am. Compl. Moreover, Radcliff did not apparently forego other compensation to take the EVP Hospice position with EHO, as she admits she continued in her former consulting role while employed with EHO. *See* Doc. 42, 2d Am. Compl., ¶ 52 ("[Radcliff's] consulting agreement with KemPharm provides that she would be paid a monthly retainer of $8,000 per month for her consulting services and have the opportunity to earn substantial incentive bonuses."); Doc. 43, Radcliff Answer & Countercl., ¶ 52 (admitting the third sentence in ¶ 52 of the Second Amended Complaint, quoted in relevant part above).

In sum, Radcliff was paid the salary she agreed to until she voluntarily resigned from her position. *Cf. Brown v. Alixa-Rx*, 2022 WL 815021, at *4 n.6 (E.D. Tex. Feb. 14, 2022), *rep. & recommendation adopted sub nom. Brown v. Alixa Rx, LLC*, 2022 WL 811054 (E.D. Tex. Mar. 16, 2022). She has plausibly pled no pecuniary loss suffered as a result of accepting the EVP Hospice

position. *See Fluorine On Call, Ltd.*, 380 F.3d at 859. Accordingly, her fraudulent-inducement claim is **DISMISSED WITHOUT PREJUDICE**.

## IV.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's Motion to Dismiss Defendant Nicholas Opalich ("Opalich")'s Amended Counterclaim for Fraudulent Inducement (Doc. 51) and **GRANTS** Plaintiff's Motion to Dismiss Defendant Tammy Radcliff ("Radcliff")'s Counterclaim (Doc. 47). Radcliff's Counterclaim and Opalich's Fraudulent-Inducement Counterclaim are each **DISMISSED WITHOUT PREJUDICE**. The Court **GRANTS LEAVE** for each Defendant to file an amended counterclaim **WITHIN FIFTEEN DAYS** of this Order to the extent that they can remedy the pleading defects identified herein.

SO ORDERED.

SIGNED: April 21, 2022.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

- 20 -